UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN C. KITCHIN, JR.,                        )
NORTH WEST AUTO BODY COMPANY,  )
and MARY MENKE, on behalf of            )
themselves and all others similarly          )
situated,                                             )
                                                           )
                        Plaintiffs,                    )          No. 4:18 CV 672 CDP
                                                           )
            v.                                            )
                                                           )
BRIDGETON LANDFILL, LLC, et al.,      )
                                                           )
                        Defendants.                  )

## <u>MEMORANDUM AND ORDER OF REMAND</u>

Plaintiffs John C. Kitchin, Jr., North West Auto Body Company, and Mary

Menke are property owners seeking damages and injunctive relief for radioactive

contamination of their respective properties allegedly caused by neighboring West

Lake Landfill, located in North St. Louis County, Missouri. Plaintiffs assert that

their property has been damaged by soil, dust, and air contamination from

improper generation, handling, storage, and disposal of radioactive materials by

four corporate defendants who are landfill owners and operators.

Plaintiffs originally filed this suit in St. Louis County Circuit Court on

behalf of themselves and all other others similarly situated, pleading various state-

law tort theories. Defendants removed the action to this Court arguing that the

allegations arise under federal law – specifically the Price-Anderson Act (PAA) as amended in 1988, 42 U.S.C. §§ 2011, *et seq.*, which provides a federal compensation regime for damages resulting from a nuclear incident; and the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601, *et seq.*, which established a federal "Superfund" to clean up uncontrolled or abandoned hazardous-waste sites, and provides for liability of persons responsible for releases of hazardous waste at these sites. In their removal petition, defendants also invoked the Class Action Fairness Act (CAFA), 28 U.S.C. §§ 1332(d), 1453, which permits federal courts to preside over certain class actions in diversity jurisdiction where the aggregate amount in controversy exceeds $5 million; where the class comprises at least 100 plaintiffs; and where there is at least "minimal diversity" between the parties, *i.e.*, at least one plaintiff class member is diverse from at least one defendant.

Plaintiffs move to remand this case to state court. I will grant the motion.

## Background

From 1942 to 1957, uranium ore was processed into various uranium compounds at a facility located in downtown St. Louis, Missouri, as part of the Manhattan Project – a United States research project designed to develop the first nuclear weapons. In the late 1940's, the Manhattan Project acquired an additional tract of land near Lambert Airport – the St. Louis Airport Site ("SLAPS") – for

storage of radioactive wastes from the uranium processing occurring at the downtown site. Contaminated scrap was also stored at the SLAPS site.

In the 1960's, some of the radioactive wastes were moved from SLAPS to a storage site on Latty Avenue in Hazelwood, Missouri ("Latty Site"). In 1973, the defendant landfill owners and operators accepted over 46,000 tons of these radioactive wastes mixed with contaminated soil and used this mixture as daily cover for the West Lake Landfill located in Bridgeton, Missouri ("Landfill").[1] The Landfill is not a licensed nuclear facility. According to the plaintiffs, despite knowing that the Landfill was not permitted to accept radioactive material and was never an adequate storage or disposal site for radioactive wastes, the defendants nevertheless dumped the wastes into the Landfill and spread them over a large area. Plaintiffs claim that about 15 acres of the Landfill are filled with radioactive wastes at a depth of up to 20 feet. Plaintiffs contend that because of defendants' spread and improper storage of these wastes, radioactive material has contaminated soil, water, and air, resulting in the contamination of surrounding communities where their properties are located.

A subsurface fire currently exists at the Landfill and emits noxious and offensive odors. Plaintiffs claim that defendants are permitting the fire to spread

---

[1] In their amended petition, plaintiffs define their use of the term "Landfill" as referring to "several inactive landfills including West Lake and Bridgeton" Landfills. Amd. Petn., ECF No. 13 at ¶ 4. However, because their specific allegations name West Lake Landfill alone, it appears that that landfill is the only relevant landfill at issue in this case.

uncontrolled, which could affect the radioactively-contaminated areas of the Landfill and cause increased risk of radioactive exposure to persons in the surrounding area.

As of December 31, 2004, the Landfill stopped accepting waste and is now used only as a transfer station. The Landfill is currently a Superfund site under the regulation of the Environmental Protection Agency (EPA) pursuant to CERCLA.

None of the defendants have entered into indemnification agreements with the United States government with respect to the complained-of activities.

## Plaintiffs' Properties

In 1995, plaintiff Kitchin purchased real property in Bridgeton, Missouri, adjacent to the Landfill. His family-owned-and-operated business, North West Auto Body Company, is located on the property. Kitchin first learned in 2017 that the property and the building housing the business were contaminated with radioactive material. Kitchin and his company contend that the auto body shop has lost significant business, revenue, and customers as a result of the contamination, and will lose future business and incur relocation costs.

Plaintiff Menke owns real property in Bridgeton, Missouri. She learned in 2018 that her property and the structure on it were contaminated with radioactive material.

Plaintiffs frequently experience offensive odors emanating from the Landfill.

Samples taken on and around plaintiffs' properties confirm a highly-elevated presence of radioactive particles matching the fingerprint of the radioactive wastes dumped at the Landfill. Trees in the vicinity of the North West Auto Body property contain radiological and organic contamination. Plaintiffs claim that the radioactive contamination of their property migrated from the Landfill and was caused by defendants' improper handling, storage, and disposal of radioactive materials. They claim that such contamination and offensive odors render their properties unfit for normal use and enjoyment, and have destroyed the fair market value of the properties.

### The Amended Petition

Plaintiffs filed their original petition in state court on February 20, 2018, and an amended petition on April 2, 2018. The case was removed to this Court on April 27, 2018. The amended petition remains the operative petition in this action.

Named as defendants in the amended petition are the owners of the Landfill – Bridgeton Landfill, LLC and Rock Road Industries, Inc.; and the operators of the Landfill – Republic Services, Inc. and Allied Services, LLC. Defendant Bridgeton Landfill removed the action from state court with the consent of defendants Republic Services and Allied Services. In the notice of removal, Bridgeton Landfill averred that named defendant Rock Road Industries merged into Bridgeton Landfill on April 9, 2018, after the amended petition was filed.

In their amended petition, plaintiffs assert the following state-law claims against all defendants: (1) trespass, (2) permanent nuisance, (3) temporary nuisance, (4) negligence, (5) negligence per se, (6) strict liability/absolute liability, (7) injunctive relief seeking scientific and medical monitoring, (8) civil conspiracy, and (9) punitive damages. As relief, plaintiffs seek damages resulting from the loss of use and enjoyment of their property, for annoyance and discomfort, for damage to personal property, and for diminution in the market value of their property. Plaintiffs also seek recovery of costs and expenses incurred as a result of their exposure to radioactive emissions, including the cost of remediation and relocation. They also seek statutory damages under Missouri law, punitive and exemplary damages, costs and attorneys' fees, and interest on all of the requested monetary relief. Finally, plaintiffs seek injunctive relief enjoining defendants from continuing in the unlawful conduct, directing defendants to identify members of the class for compensation, and compelling defendants to clean up all contamination and to provide medical monitoring.

For the following reasons, I do not have jurisdiction over plaintiffs' claims or over this action. I will therefore remand this case to state court.

## Legal Standard

Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "It is to be presumed that a cause lies

outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (citations omitted).

A federal district court may exercise removal jurisdiction only where the court would have had original subject-matter jurisdiction had the action initially been filed there. *Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 922 (8th Cir. 2000) (citing 28 U.S.C. § 1441(b)). The party seeking removal and opposing remand carries the burden of establishing federal subject-matter jurisdiction by a preponderance of the evidence. *Kokkonen*, 511 U.S. at 377; *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 620 (8th Cir. 2010). Generally, a court must resolve all doubts about federal jurisdiction in favor of remand to state court. *In re Prempro*, 591 F.3d at 620.

## Federal-Question Jurisdiction

"The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Bowler v. Alliedbarton Sec. Servs., LLC*, 123 F. Supp. 3d 1152, 1155 (E.D. Mo. 2015) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)). *See also Gaming Corp. of Am. v. Dorsey & Whitney*, 88 F.3d 536, 542 (8th Cir. 1996) ("The 'well-pleaded complaint rule' requires that a federal cause of action must be stated on the face of the complaint before the defendant may remove the

action based on federal question jurisdiction.") (quoting *Caterpillar*, 482 U.S. at 392). Because federal law provides that plaintiffs are the "masters" of their claims, plaintiffs "may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar*, 482 U.S. at 392.

In cases where a cause of action based on a federal statute does not appear on the face of the complaint, preemption based on a federal statutory scheme may nevertheless apply in circumstances where "the pre-emptive force of a statute is so extraordinary that it converts an ordinary state common-law complaint into one stating a federal claim." *Caterpillar*, 482 U.S. at 393. *See, e.g., Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987) (former employee's claims alleging breach of contract, retaliatory discharge, and wrongful termination of disability benefits in state-court complaint were preempted by ERISA and necessarily federal in character; removal under 28 U.S.C. § 1441(a) was therefore proper). "Where a complaint raises issues to which federal law applies with complete preemptive force, the Court must look beyond the face of the complaint in determining whether remand is proper." *Green v. Arizona Cardinals Football Club, LLC*, 21 F. Supp. 3d 1020, 1025 (E.D. Mo. 2014). *See also Strong v. Republic Servs., Inc.*, 283 F. Supp. 3d 759, 763 (E.D. Mo. 2017). If upon such examination I find that a federal statute provides "an exclusive cause of action for the claim asserted and also set[s] forth procedures and remedies governing that cause of action," I may

conclude that plaintiffs have "simply brought a mislabeled federal claim" that could be asserted under some federal statute. *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 247-48 (8th Cir. 2012) (internal quotation marks and citations omitted).

In addition, federal-question jurisdiction exists where state law claims implicate significant federal issues. *Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005). "The doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law[.]" *Id.* While there is no single test for jurisdiction over federal issues rooted in state-law claims between non-diverse parties, the relevant question is "does a state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314; *see also Baker v. Martin Marietta Materials, Inc.*, 745 F.3d 919, 924 (8th Cir. 2014).

Against this backdrop, I turn to defendants' contention that the claims raised in plaintiffs' amended petition, although couched in terms of state-law violations, are completely preempted by the PAA and, further, raise claims and/or significant federal issues under CERCLA.

A.     Price-Anderson Act

Defendants contend that the PAA confers exclusive federal jurisdiction over

this action and completely preempts plaintiffs' state-law claims. For the following reasons, plaintiffs' claims do not arise under the PAA.

1.    *Understanding the Background and Purpose of the PAA*[2]

The Price-Anderson system is a comprehensive, compensation-oriented system of liability insurance for Department of Energy (DOE) contractors and Nuclear Regulatory Commission (NRC) licensees operating nuclear facilities. Under the Price-Anderson system, there is a ready source of funds available to compensate the public after an accident, and the channeling of liability to a single entity and waiver of defenses insures that protracted litigation will be avoided. In short, the PAA provides a type of "no fault" insurance, by which all liability after an accident is assumed to rest with the facility operator, even though other parties (such as subcontractors or suppliers) might be liable under conventional tort principles.

The PAA was enacted in 1957 as an amendment to the Atomic Energy Act (AEA) of 1954. The purpose of the AEA was to open up nuclear development to civilian industry. But because of the risk of extensive liability potentially facing entities in the event of a nuclear accident, civilian response to the AEA was limited. Accordingly, to remove this deterrent to private

---

[2] The following background and summary is largely taken from Senate Report No. 100-70 addressing the Price-Anderson Amendments Act of 1988. S. Rep. No. 100-70, 1988 U.S.C.C.A.N. 1424, 1988 WL 169872.

participation in the development of nuclear energy, Congress passed the PAA to 1) assure adequate public compensation in case of a nuclear accident, and 2) set a limit on the liability of private industry. As enacted, the PAA established liability limits for commercial power plants licensed by the Atomic Energy Commission (AEC) (now licensed by the NRC) through a combination of private insurance and indemnification by the federal government. For contractor-operated activities of the AEC (now contractor activities of the DOE), liability limits were established by federal indemnification alone.[3]

When enacted in 1957, the PAA provided federal-question jurisdiction over "extraordinary nuclear occurrences" only. An "extraordinary nuclear occurrence" was defined in the AEA as "an occurrence '[t]hat has resulted or probably will result in substantial damages to persons offsite or property offsite.'" S. Rep. No. 100-70, 15, 1988 U.S.C.C.A.N. 1424, 1427. Therefore, unless diversity jurisdiction existed, most nuclear-exposure claims were litigated in state court. *See* Nathan White, *Arguments Not Raised: How the Plaintiffs' Missed Opportunity Led to the Tenth Circuit's Decision in June v. Union Carbide Corp.*, 2011 B.Y.U. L.

---

[3] With the Energy Reorganization Act of 1974 (ERA), Congress abolished the AEC and created the NRC, to which some of the AEC's duties were transferred, including all of the AEC's licensing functions. All licenses previously issued by the AEC and in effect upon ERA's passage remained in effect. Pub. L. No. 93-438, 88 Stat. 1233 (1974). The ERA also created the Energy Research and Development Administration (ERDA), which assumed the AEC's research and development responsibilities. *Id.* In 1977, the ERDA was terminated and its responsibilities were transferred to the newly-created DOE. *See* Department of Energy Organization Act, Pub. L. No. 95-91, 91 Stat. 565 (1977).

Rev. 245, 248 (2011). With the renewal of the PAA in 1966, Congress required licensees and contractors to waive traditional defenses of state tort law against claims of an extraordinary nuclear occurrence in order to facilitate recovery by plaintiffs. S. Rep. No. 100-70, 15, 1988 U.S.C.C.A.N. 1424, 1427.

In 1975, Congress added a provision to the PAA to phase out federal indemnity for NRC licensees and replace it with a self-insurance pool-type arrangement. Under this arrangement, in the event that damages from a commercial nuclear power plant accident were likely to exceed the coverage available from private insurance, each NRC reactor licensee would be assessed up to a capped amount to pay a pro-rated share of the damages in excess of private insurance available.[4] For such accidents, therefore, the limited liability plan consisted of a combination of the maximum amount of private insurance and contributions made by each of the reactor licensees. The federal-indemnification plan remained in place for DOE contractors for DOE-contractor-related accidents. S. Rep. No. 100-70, 15, 1988 U.S.C.C.A.N. 1424, 1428. However, whether to enter into indemnification agreements with such contractors was at the Energy Secretary's discretion, based on the Secretary's determination as to whether the contractor's activities involved the risk of public liability for a "substantial"

_____

[4] Licensees were required to provide proof to the NRC that they had the maximum amount of private nuclear liability insurance. S. Rep. No. 100-70, 43, 1988 U.S.C.C.A.N. 1424, 1452.

nuclear incident.[5]

In 1988, Congress passed the Price-Anderson Amendments Act ("1988 PAA"), which, among other things, removed the Energy Secretary's discretion to indemnify DOE contractors. Under the 1988 PAA, federal indemnification to DOE contractors was now required for all nuclear activities, regardless of whether the risk of a nuclear incident was "substantial" or not. The purpose of this amendment was to guarantee to the public that the Price-Anderson system would be available to provide compensation in the event of a nuclear incident. Accordingly, the DOE was now mandated to "enter into agreements of indemnification . . . with any person who may conduct activities under a contract with the Department of Energy that involve the risk of public liability[.]" 42 U.S.C. § 2210(d)(1)(A). *See also* 48 C.F.R. §§ 950.7006, 952.250-70. With these mandated agreements, the DOE was charged with providing indemnification to such persons on claims for public liability that "arise[] out of or in connection with the activities under [the DOE] contract" *and* "arise[] out of or result[] from a nuclear incident[.]"). 48 C.F.R. § 952.250-70(d)(2).

The 1988 PAA amendments also broadened federal jurisdiction beyond just "extraordinary nuclear occurrences" – that is, those occurrences involving

---

[5] *See Dep't of Energy Rep. to Congress on the Price-Anderson Act* (March 1999), *available at* *https://www.energy.gov/sites/prod/files/gcprod/documents/paa-rep.pdf*.

"substantial" damages – and created a federal cause of action for "any public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n)(2). The amendments also provided that such public liability actions filed in state court were to be removed to federal court. *Id.*

2.    *Claims Arising Under the PAA*

"With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place, . . . shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy." 42 U.S.C. § 2210(n)(2). A "public liability action" is "any suit asserting public liability." 42 U.S.C. § 2014(hh). And "public liability" means "any legal liability arising out of or resulting from a nuclear incident[.]" 42 U.S.C. § 2014(w). Accordingly, only suits that involve "nuclear incidents" as defined by the PAA are subject to PAA federal-question jurisdiction. *See Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015); *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186 (5th Cir. 2011); *Strong v. Republic Servs., Inc.*, 283 F. Supp. 3d 759 (E.D. Mo. 2017); *McClurg v. MI Holdings, Inc.*, 933 F. Supp. 2d 1179 (E.D. Mo. 2013); *Banks v. Cotter Corp.*, No. 4:18-CV-00624 JAR, 2019 WL 1426259 (E.D. Mo. Mar. 29, 2019).

Recently, this district court has had the opportunity to squarely address the

question of whether a "nuclear incident" under the PAA requires the alleged

unlawful conduct to have arisen from NRC-licensed activities or under a DOE

contract with agreements of indemnification. *See Strong v. Republic Servs., Inc.*,

283 F. Supp. 3d 759 (E.D. Mo. 2017); *Banks v. Cotter Corp.*, No. 4:18-CV-00624

JAR, 2019 WL 1426259 (E.D. Mo. Mar. 29, 2019). In both cases, the court held

that there cannot be a nuclear incident under the PAA without such an applicable

license or indemnity agreement. *Strong*, 283 F. Supp. 3d at 772; *Banks*, 2019 WL

1426259, at *6. For the following reasons, I agree with this conclusion.

As defined in the 1988 PAA, a "nuclear incident" is

> any occurrence, including an extraordinary nuclear occurrence, within
> the United States causing, within or outside the United States, bodily
> injury, sickness, disease, or death, or loss of or damage to property, or
> loss of use of property, arising out of or resulting from the radioactive,
> toxic, explosive, or other hazardous properties of source, special
> nuclear, or byproduct material. . . .

42 U.S.C. § 2014(q). In further defining "nuclear incident," § 2014(q) refers to the

term's use in 42 U.S.C. § 2210(c) and (d), which, significantly, governs the PAA

indemnification plan for NRC licensees and DOE contractors.[6] Specifically, §

---

[6] *And provided further,* That as the term [nuclear incident] is used in section
2210(d) of this title, it shall include any such occurrence outside the United States
if such occurrence involves source, special nuclear, or byproduct material owned
by, and used by or under contract with, the United States: *And provided further,*
That as the term is used in section 2210(c) of this title, it shall include any such
occurrence outside both the United States and any other nation if such occurrence
arises out of or results from the radioactive, toxic, explosive, or other hazardous
properties of source, special nuclear, or byproduct material licensed pursuant to
subchapters V, VI, VII, and IX of this division, which is used in connection with

2210(c) requires the NRC, "*with respect to licenses issued* between August 30, 1954, and December 31, 2025," to "agree to indemnify and hold harmless *the licensee* and other persons indemnified . . . from public liability arising from nuclear incidents[.] . . . *Such a contract of indemnification shall cover public liability arising out of or in connection with the licensed activity.*" 42 U.S.C. § 2210(c) (emphasis added). Section 2210(d) requires the DOE to enter into indemnification agreements with "any person who may conduct activities *under a contract* with the Department of Energy that involve the risk of public liability[.]" 42 U.S.C. § 2210(d)(1)(A) (emphasis added). Section 2210(d) further requires these indemnification agreements to be "the exclusive means of indemnification for public liability arising from activities" conducted under DOE contracts. 42 U.S.C. § 2210(d)(1)(B)(i)(I).[7]

Accordingly, when the definition is read *in toto* and in conjunction with § 2210, "nuclear incidents" are those occurrences within and outside the United States that arise from activities conducted under DOE contracts or in connection

---

the operation of a licensed stationary production or utilization facility or which moves outside the territorial limits of the United States in transit from one person licensed by the Nuclear Regulatory Commission to another person licensed by the Nuclear Regulatory Commission.

42 U.S.C. § 2014(q).

[7] To the extent defendants argue that "*other* persons indemnified" shows Congress's consideration that PAA coverage would extend to non-NRC-licensees and/or non-DOE-contractors, the PAA clearly states that any statutory indemnification – to whomever – is for only those liabilities that arise out of or are connected with activities conducted under NRC licenses or DOE contracts. 42 U.S.C. § 2210(c), (d).

- 16 -

with NRC-licensed activity. When considered with the plain text of § 2210(c) and (d) – that public liability actions can arise only from activities under a contract with the DOE or in connection with NRC-licensed activity – I must agree with the court's observation in *Strong* that "the terms 'nuclear incident' and 'occurrence' are inextricably intertwined with 'licenses' and 'indemnification agreements,' thus suggesting licenses and indemnification agreements are an integral part of the PAA's statutory scheme[.]" *Strong*, 283 F. Supp. 3d at 771. In light of this, I also agree with the *Strong* court's conclusion that, therefore, "there cannot be a nuclear incident without an applicable license or indemnity agreement." *Id.*

My review of the legislative history of the PAA supports this conclusion. Nothing in the PAA – either originally enacted or through its evolution – provides that it is, or was intended to be, the exclusive remedy for all claims involving nuclear radiation. Instead, as defined by Congress itself, "The Price-Anderson system is a comprehensive, compensation-oriented system of liability insurance *for Department of Energy contractors and Nuclear Regulatory Commission licensees* operating nuclear facilities." S. Rep. No. 100-70, 14, 1988 U.S.C.C.A.N. 1424, 1426 (emphasis added). The stated purpose of the 1988 PAA amendments was "to modify and extend the portions of the Price-Anderson Act that provide for public liability coverage for contractors of the Department of Energy," S. Rep. No. 100-70, 12, 1988 U.S.C.C.A.N. 1424, 1425, and the amendments achieved this in part

by mandating federal indemnification to DOE contractors (and subcontractors) for all risks of nuclear incidents arising out of their DOE-contracted activities instead of only risks determined at the discretion of the Secretary of Energy to be substantial.  The amendments further achieved the intended purpose by removing the requirement that incidents be "substantial" in order to fall within the federal court's subject-matter jurisdiction.  However, nothing in the 1988 amendments altered the purpose of the PAA, which is to provide a compensation plan and liability assessment for nuclear incidents arising out of DOE-contracted activity and NRC-licensed activity.  *See Banks*, 2019 WL 1426259, at *8.

> [I]n light of the PAA's concerns related to liability limitation and indemnification, the Court is not convinced that the 1988 amendments were meant to extend the reach of the PAA to activities not covered by applicable licenses or indemnity agreements.  Defendants' construction overlooks the original purposes and framework of the AEA and the PAA – to require those involved in the nuclear industry to obtain licenses and maintain financial protections.

*Id.*

The statutory construction and legislative history of the PAA shows it to apply only to public liability claims arising out of NRC-licensed activity or DOE-contracted activity operating under indemnification agreements.  *See Strong* 283 F. Supp. 3d at 772; *Banks*, 2019 WL 1426259, at *6.  The amended petition here does not allege any such activity.  The PAA does not apply to plaintiffs' claims.

### 3. Cotter Corporation's Source Material License

In their notice of removal, defendants aver that Cotter Corporation was the entity that handled, processed, and moved the radioactive wastes from the Latty Site to the Landfill.[8]  Defendants further aver that Cotter Corporation engaged in this activity pursuant to a Source Material License issued to it (Cotter) by the AEC in 1969.  Defendants argue, therefore, that to the extent a license is required for federal jurisdiction under the PAA, plaintiffs' claims involve radioactive materials that were handled and disposed of by an AEC licensee, making the licensed activity inextricably part of the claims and thus within the PAA.

Plaintiffs argue that the radioactive wastes at issue in this action are uranium mill tailings made from the uranium processing in downtown St. Louis.  Plaintiffs urge me to adopt the *Strong* court's reasoning that Cotter's 1969 license could not have covered the radioactive material delivered by Cotter to the Landfill in 1973 because Congress did not include uranium mill tailings within the definition of covered "byproduct materials" until 1978.  *See Strong*, 283 F. Supp. 3d at 773.  In their amended petition, however, plaintiffs do not specifically allege that the material at issue was uranium mill tailings.  Instead, plaintiffs claim that the off-site radioactive waste found on their properties "has the fingerprint" of the uranium ore processed in St. Louis that generated the "hazardous, toxic, carcinogenic,

---

[8] Cotter Corporation is not a defendant in this action.

radioactive wastes" that were dumped into the Landfill.  (ECF 13 at ¶¶ 4, 98 B., 112.)[9]

Regardless of whether uranium mill tailings are the radioactive wastes at issue in this case or whether plaintiffs properly pled that they are, Cotter's license nevertheless does not affect my determination that the PAA does not apply to plaintiffs' claims.

Cotter Corporation's 1969 Source Material License authorized it to "receive, possess and import the source material [uranium]; to use such material for the purpose(s) and at the place(s) designated [Latty Site]; and to deliver or transfer such material to persons authorized to receive it[.]"  (ECF 1-5, Feingold Decl., Exh. D.)  As alleged by plaintiffs in their amended petition, their damages do not arise from the use of the radioactive material *at the Latty Site*, but rather from the defendants' unauthorized receipt of the material and their unauthorized use of the material at an unauthorized site, the Landfill.  Cotter's Source Material License did not cover its delivery or transfer of the material to such unauthorized entities.  Nor did it cover defendants' activities at the Landfill.  Cotter's license therefore does not provide a basis for federal subject-matter jurisdiction under the PAA.  *See Banks*, 2019 WL 1426259, at *9.

_____

[9] With their reply in support of remand, plaintiffs submitted declarations from experts declaring, *inter alia*, that the wastes at issue here are in fact mill tailings and, further, that the PAA does not apply to plaintiffs' claims.  Defendants ask me to strike these declarations.  Because I have not considered these declarations in making my determination here, I will deny defendants' motion to strike as moot.

None of the defendants here is an indemnitee or licensee as contemplated under the PAA, and their alleged conduct does not arise from NRC-licensed activity or under a DOE contract with indemnification. The PAA therefore does not apply to plaintiffs' claims, and defendants have failed to meet their burden of establishing federal-question jurisdiction under the PAA.

B.    CERCLA

Defendants claim that the injunctive relief sought in plaintiffs' amended petition – specifically, for complete clean-up of the contamination, to prevent further contamination, and to decrease contamination risks to plaintiffs' property – constitutes a CERCLA challenge because such relief would interfere with the EPA's remediation plans at the federal Superfund site. They further contend that because plaintiffs allege that the Landfill is the source of the radioactive contamination found on their properties, and the Landfill is a federal Superfund site over which the EPA has exclusive jurisdiction, then the EPA likewise has exclusive jurisdiction over their properties under CERCLA. I reject both arguments.

1.    *CERCLA Challenge*

Nothing in plaintiffs' amended petition shows that they are requesting relief that would interfere with the EPA's remediation plans. Although plaintiffs make reference to the Landfill being a Superfund site, their claims do not expressly

challenge the effectiveness of the Landfill remedy, request modification of the remedial plan, or seek specific action that could conflict with the remediation process.[10] And defendants offer no explanation as to how plaintiffs' requested relief would alter EPA's plans in a way that is somehow inconsistent with any particular federal obligation or requirement.

Plaintiffs seek relief only under common law theories that have long been recognized by Missouri courts as a basis for recovery from parties found to be responsible for personal injury and property damage occurring as a result of the release of toxic chemical wastes or other hazardous substances into the environment. *E.g.*, *Elam v. Alcolac, Inc.*, 765 S.W.2d 42 (Mo. Ct. App. 1988) (nuisance, negligence); *Kansas City v. W.R. Grace & Co.*, 778 S.W.2d 264 (Mo. Ct. App. 1989) (negligence, strict liability, civil conspiracy), *abrogated on other grounds by Ellison v. Fry*, 437 S.W.3d 762 (Mo. banc 2014). Plaintiffs do not cite CERCLA as a basis for their claims; nor do they seek reimbursement of response costs or any other form of relief available under its provisions.

---

[10] I disagree with defendants that plaintiffs' counsel's remarks made at a press conference regarding site clean-up constitute "other paper" under 28 U.S.C. § 1446(b)(3) sufficient to confer federal jurisdiction over this action. (*See* ECF 39 at pp. 21-22.) Regardless of the later transcription of the remarks, nothing before the Court shows that the press conference at issue here approached the level of authenticity or reliability afforded court-recognized "other paper" designations, such as deposition transcripts, discovery responses, settlement offers, or other official communications between parties. *See Huffman v. Saul Holdings Ltd. P'ship*, 194 F.3d 1072, 1078 (10th Cir. 1999) ("[T]he circumstances permitting removal must normally come about as a result of a voluntary act on the part of the plaintiff.") (citing *DeBry v. Transamerica Corp.*, 601 F.2d 480, 486-88 (10th Cir. 1979)). *See also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir. 1996).

Moreover, CERCLA does not completely preempt plaintiffs' claims or otherwise foreclose plaintiffs from relying on common law theories for the relief they seek. In the absence of complete preemption, defendants' contentions regarding the potential effect of injunctive relief on the existing remedial program can only be regarded as federal defenses to properly raised state law claims, which state courts are competent to adjudicate. *See In re Pfohl Bros. Landfill Litig.,* 67 F. Supp. 2d 177, 184-85 (W.D.N.Y. 1999) (CERCLA neither preempts state law toxic tort claims nor creates a federal cause of action for personal injury or property damage caused by release of hazardous substances; defendants' interjection of issues relating to applicability of CERCLA found insufficient to confer federal-question jurisdiction) (citing *Merrell Dow Pharm., Inc. v. Thompson,* 478 U.S. 804, 808 (1986) ("A defense that raises a federal question is inadequate to confer federal jurisdiction.")).

2.  *Exclusive EPA Jurisdiction*

There is no dispute that the EPA has exclusive jurisdiction over the Landfill Superfund site. Defendants argue that this jurisdiction also includes plaintiffs' contaminated properties because a "facility" over which the EPA has exclusive jurisdiction under CERCLA is defined as "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, *or otherwise come to be located*[.]" 42 U.S.C. § 9601(9) (emphasis added). Accordingly, defendants

argue, because hazardous materials allegedly came to be located on plaintiffs' properties, those properties are necessarily within the EPA's exclusive jurisdiction under CERCLA. To take defendants' argument to its logical conclusion, then, even with a properly-pled claim under 42 U.S.C. § 9607, private property owners could themselves be liable under CERCLA because their contaminated property, for which they otherwise would seek to recover reimbursement for response costs, would itself be a "facility" even without release of hazardous material from their property. This is not a logical reading of CERCLA, nor does it further CERCLA's intended purpose.

As to defendants' argument that the EPA nevertheless has exclusive jurisdiction over the Landfill Superfund site, nothing in the amended petition shows that plaintiffs seek relief that would require defendants to take action that would overlap with, alter, or contradict any EPA remedy that is being reviewed and/or or taken at the site under CERCLA. Indeed, nothing in the amended petition takes away from the EPA's jurisdiction over the Superfund site. CERCLA does not completely preempt state tort liability for damages caused by the release of hazardous substances, *see Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 138 (2d Cir. 2010), and the causes of action set forth in the amended petition do not necessarily depend on resolution of substantial questions regarding response-cost liabilities or other obligations imposed by

CERCLA.  Nor have defendants demonstrated that plaintiffs are making a CERCLA challenge by requesting relief that would interfere with the EPA's remediation plans.  "[T]he mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharm.*, 478 U.S. at 813; *see also MSOF Corp. v. Exxon Corp.*, 295 F.3d 485, 491-92 (5th Cir. 2002) (finding that neither CERCLA nor a federal consent decree created federal "arising under" jurisdiction over plaintiffs' state law claim).

Accordingly, resolving all doubts against removal, I find that defendants have failed to meet their burden of establishing that the amended petition raises any actually disputed and/or substantial issues arising under CERCLA.  *Grable & Sons*, 545 U.S. at 314.

## Class-Action Jurisdiction Under CAFA

CAFA "confers federal jurisdiction over class actions where, among other things, 1) there is minimal diversity; 2) the proposed class contains at least 100 members; and 3) the amount in controversy is at least $5 million in the aggregate." *Plubell v. Merck & Co.*, 434 F.3d 1070, 1071 (8th Cir. 2006) (citing 28 U.S.C. § 1332(d)); *see also Raskas v. Johnson & Johnson*, 719 F.3d 884, 886-87 (8th Cir. 2013).  "Although CAFA expanded federal jurisdiction over class actions, it did not alter the general rule that the party seeking to remove a case to federal court bears the burden of establishing federal jurisdiction." *Westerfeld v. Independent*

*Processing, LLC*, 621 F.3d 819, 822 (8th Cir. 2010).

Plaintiffs do not dispute that defendants met their burden of establishing federal jurisdiction under CAFA. They claim, however, that the "local controversy" exception to CAFA applies to the circumstances of this case, requiring me to decline to exercise jurisdiction and remand the matter to state court. I agree.

Congress established two mandatory exceptions to CAFA's broad expansion of federal jurisdiction over class actions. Under the local-controversy exception invoked by the plaintiffs here, a district court must decline to exercise jurisdiction over a class action in which 1) more than two-thirds of the class members in the aggregate are citizens of the state in which the action was originally filed, 2) at least one defendant "from whom significant relief is sought by members of the plaintiff class" and "whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class" is a citizen of the state in which the class action was originally filed, 3) the principal injuries were incurred in the state in which the action was filed, and 4) no other class action alleging similar facts was filed in the three years prior to the commencement of the current class action. 28 U.S.C. § 1332(d)(4)(A); *Westerfeld*, 621 F.3d at 822. "[T]he purpose of each of these criteria is to identify a truly local controversy – a controversy that uniquely affects a particular locality to the exclusion of all others." S. Rep. No. 109-14, 39,

2005 U.S.C.C.A.N. 3, 38. "[C]lass actions with a truly local focus should not be moved to federal court . . . because state courts have a strong interest in adjudicating such disputes." *Id.* Accordingly, where the controversy "at its core" is a local one, and the state court where it was brought has a strong interest in resolving the dispute, the case should remain in state court. S. Rep. No. 109-14, 41, 2005 U.S.C.C.A.N. 3, 39.

In seeking remand on the basis of the local-controversy exception, plaintiffs bear the burden of establishing that the exception applies. *Westerfeld*, 621 F.3d at 822-23. I may look only to the removed petition in deciding whether the local controversy criteria are met. *Coleman v. Estes Express Lines*, 631 F.3d 1010, 1017 (9th Cir. 2011), *quoted approvingly in City of O'Fallon, Mo. v. CenturyLink, Inc.*, 930 F. Supp. 2d 1035, 1049-50 (E.D. Mo. 2013); *Moore v. Scroll Compressors, LLC*, No. 14-03109-CV-S-GAF, 2014 WL 12597511, at *8 (W.D. Mo. July 8, 2014).

Defendants argue that plaintiffs cannot meet the first two elements of the local-controversy exception, namely, the two-thirds requirement and the local "significant" defendant requirement. Their argument as to the two-thirds requirement can be disposed of easily. In the amended petition, plaintiffs seek relief on behalf of themselves and of the putative class. The named plaintiffs in this action are Missouri citizens. As for the putative class, plaintiffs identify two

subclasses whose members are limited to "Missouri citizens." Although defendants argue that this class definition runs counter to plaintiffs' intention to seek relief for all individuals and businesses in the vicinity of the Landfill, it is well understood that plaintiffs are the masters of their complaint. *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22 (1913). I will not read into the amended petition the existence of non-Missouri-citizen class members where they are expressly excluded. Since the only class members in this action are Missouri citizens, plaintiffs have met the two-thirds requirement of the local-controversy exception.

I also conclude that plaintiffs have met the local significant defendant requirement. When plaintiffs filed this action and at the time they amended their petition, named defendant Rock Road Industries was a Missouri citizen, having been incorporated in the State of Missouri and having its principal place of business in Missouri. Although defendants aver that Rock Road Industries has since been merged into Bridgeton Landfill, an LLC whose membership structure shows it to be a citizen of Delaware and Arizona, I look only to the removed petition to determine whether the local controversy criteria are met. Accordingly, because there is no dispute that Rock Road Industries was properly identified as a citizen of Missouri in the amended petition that was removed to this Court, and this class action was originally filed in Missouri, Rock Road Industries satisfies the

"local" defendant element of the analysis.

It likewise satisfies the "significant" element. The first criterion is whether "significant relief is sought" from the local defendant. The second criterion is whether the defendant's "alleged conduct forms a significant basis for the claims" asserted by the proposed class. Again, I look only to the removed petition in deciding whether both criteria are met. *Coleman*, 631 F.3d at 1017.

As to the "significant relief" provision, I look to the relief plaintiffs seek from the local defendant, and not the relief that may be obtained from that defendant. *Coffey v. Freeport McMoran Copper & Gold*, 581 F.3d 1240, 1244 (10th Cir. 2009), *quoted approvingly in CenturyLink*, 930 F. Supp. 2d at 1049. A plaintiff-class seeks significant relief from a local defendant where all the class members have claims against the defendant and all class members want to hold the local defendant jointly and severally liable for their claims. *Id.* We have that, and more, here. The amended petition in this case seeks damages equally from all defendants. There is nothing in the amended petition to indicate that Rock Road Industries is a nominal defendant or that its subsidiary status undercuts the substantial monetary relief sought by plaintiffs. In addition, the amended petition seeks injunctive relief from all defendants, and nothing in the petition indicates that the injunctive relief sought is in and of itself insignificant or that Rock Road Industries would be incapable of complying with an injunction. Plaintiffs have

thus satisfied the "significant relief" requirement of the local-controversy exception. *See CenturyLink*, 930 F. Supp. 2d at 1051.

With the "significant basis" provision, there is no "absolute quantitative requirement." *Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 156 (3d Cir. 2009), *quoted approvingly in CenturyLink*, 930 F. Supp. 2d at 1047. Instead, I must compare the alleged conduct of the local defendant to the alleged conduct of all the defendants against the backdrop of all of the claims of the action. *Id.*; *see also Westerfeld*, 621 F.3d at 825. "The local defendant's alleged conduct must be an *important* ground for the asserted claims in view of the alleged conduct of all the Defendants." *Kaufman*, 561 F.3d at 157 (emphasis in *Kaufman*).

Here, plaintiffs' amended petition alleges the same claims against all defendants. It claims that the defendants all engaged in the same conduct, including knowingly and improperly accepting radioactive wastes; improperly dumping and spreading such wastes over several acres of the Landfill; and causing radioactive contaminants to be dispersed, resulting in damage to neighboring properties and communities. Plaintiffs also claim that all defendants maintained daily control over the management, operation, and environmental decisions of the Landfill, thereby making them all responsible for the damages alleged. The conduct of Rock Road Industries is the same conduct alleged against the other defendants. There is no need or requirement for me to conduct a "mini-trial" to

adduce evidence as to the specific conduct of each of the defendants. *Coffey*, 581 F.3d at 1245; *CenturyLink*, 930 F. Supp. 2d at 1051. Rock Road Industries' status as a subsidiary is irrelevant since the conduct alleged is the same for all defendants. The amended petition's allegations indicate that Rock Road Industries' conduct forms a significant basis of all claims asserted.

Finally, contrary to defendants' assertion, plaintiffs' filing of their motion to remand less than two months after removal was reasonable. *See Graphic Commc'ns Local 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 636 F.3d 971, 975-76 (8th Cir. 2011) (§ 1447(c)'s 30-day requirement to file motion to remand does not apply to CAFA's local-controversy exception; instead, remand motion must be filed within a "reasonable" time). At the time plaintiffs sought remand, the case was still in its infancy. The three removing defendants had filed their answers, and an order scheduling the Rule 16 conference had been entered. Discovery had not yet begun. Other than a within-district transfer between judges, nothing else of note happened in the case. Further, CAFA was not the only basis upon which the defendants removed this case from state court. Given that additional complex issues regarding subject-matter jurisdiction were present, it was not unreasonable for plaintiffs to address all of these issues in one motion to remand instead of piecemeal. Filing such a comprehensive motion 56 days after removal was not unreasonable in the circumstances of this case.

## Conclusion

Defendants have failed to meet their burden of establishing federal subject-matter jurisdiction for purposes of the PAA and CERCLA. Further, plaintiffs have met their burden of establishing that the local-controversy exception to CAFA jurisdiction applies in this case. Accordingly, this action must be remanded to state court. In light of this determination, I need not address plaintiffs' argument that applying the PAA to their claims would deprive them of due process.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that plaintiffs' Motion for Remand [27] is granted. Their alternative Motion for Leave to Amend and Remand is denied as moot.

**IT IS FURTHER ORDERED** that defendants' Motion to Strike Plaintiffs' Experts or, in the Alternative, for Leave to File Sur-Reply [45]; and Motion for Oral Argument [47] are denied as moot.

**IT IS FURTHER ORDERED** that this case is remanded to the Circuit Court of St. Louis County, Missouri, from which it was removed.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 8th day of May, 2019.