**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| JOHN C. KITCHIN, JR., SHARON BISHOP, ) <br> MELISSA MITCHELL, MATT VOSS, and ) <br> BLUEGRASS LAWNCARE OF ST. LOUIS, ) <br> LLC, d/b/a BLUEGRASS LANDSCAPE & ) <br> SNOW MANAGEMENT, on behalf of ) <br> themselves and all others similarly situated, ) <br> ) <br>     Plaintiffs, ) <br> ) <br>     vs. ) <br> ) <br> BRIDGETON LANDFILL, LLC, ) <br> REPUBLIC SERVICES, INC., ) <br> ALLIED SERVICES, LLC, and ) <br> ) <br> COTTER CORPORATION ) <br>     **Serve: CT Corporation Systems** ) <br>         **7700 E. Arapahoe Rd., Ste. 220** ) <br>         **Centennial, CO 80112** ) <br> ) <br>     Defendants. ) | Case No. 4:18-cv-00672-CDP <br><br> **JURY TRIAL DEMANDED** |

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**

COME NOW Plaintiffs John C. Kitchin, Jr., Sharon Bishop, Melissa Mitchell, Matt Voss and Bluegrass Lawncare of St. Louis, L.L.C., d/b/a Bluegrass Landscape & Snow Management, on behalf of themselves and all others similarly situated, by and through counsel, and for their Second Amended Class Action Complaint against Defendants Bridgeton Landfill, LLC, Republic Services, Inc., Allied Services, L.L.C., and Cotter Corporation, state and allege as follows:

## I.   INTRODUCTION

1.      In 1969, Cotter Corporation ("Cotter") purchased and assumed responsibility for radioactive waste materials (also known as "mill tailings") which were created by the extraction and/or concentration of uranium by a government contractor as part of the Manhattan project.

1

2.      Cotter dried and shipped some of these radioactive wastes at a site on Latty Avenue in Hazelwood, Missouri. These wastes were shipped to Cotter's plant in Canon City, Colorado.

3.      Included in the radioactive wastes that Cotter purchased were approximately 8,700 tons of leached barium sulfate residues ("LBSR"). It did not make commercial sense for Cotter to ship these wastes to its plant in Colorado.

4.      After years of seeking legal and proper disposal options for the LBSR, in 1973, Cotter mixed the 8,700 tons of LBSR with contaminated soil at the Latty Avenue Site. Despite knowing that these materials were radioactive, Cotter Corporation caused to be dumped, and the Landfill Defendants accepted, over 46,000 tons of the radioactive soil mixture at the West Lake and/or Bridgeton Landfills (collectively referred to as the "Landfill"), which was not permitted to receive such wastes.

5.      Since then, the radioactive waste material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people. These everyday St. Louisans now find their lives disrupted, their homes contaminated, their businesses upended, and their properties devalued.

6.      Tests conducted by representatives of the United States of America and others now confirm that the areas around the Landfill, including Plaintiffs' properties, are contaminated with the same radioactive wastes that Cotter purchased in 1969.

7.      Plaintiffs own property surrounding the landfill which is contaminated with radioactive wastes from the Landfill in excess of normal background levels.

8.      These radioactive wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth

2

defects may take a number of years after exposure to the radioactive material to appear.

9.      Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the widespread damage they have caused. Instead, Defendants have hidden behind misstatements and omissions, misleading the public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

10.     Plaintiffs, as well as all members of the proposed class, have sustained significant damages as a result of Defendants' conduct. Defendants should compensate Plaintiffs for their damages, and provide further relief as set forth below in this Complaint.

## II.      <u>JURISDICTION AND VENUE</u>

11.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 and 28 U.S.C. § 1332(d), as mandated by the Eighth Circuit Court of Appeals. *See* 3 F.4th 1089 (8th Cir. 2021), *cert. denied,* 142 S. Ct. 1111 (Feb. 22, 2022).

12.     Venue is proper in the Eastern District of Missouri as the landfill, the radioactive contamination, and the putative class members are located in St. Louis County, Missouri. Therefore, a substantial part of the events or omissions alleged herein arose within this District, pursuant to 28 U.S.C. § 1391(b)(2), and within this Division.

## III.     <u>THE PARTIES</u>

### Plaintiffs

13.     Plaintiff John C. Kitchin, Jr. is a Missouri citizen who owns real property located at 12990 St. Charles Rock Road in Bridgeton, Missouri.  The Kitchin property adjoins the Landfill boundary.

14.     Plaintiff Sharon Bishop is a Missouri citizen who owns real property located at 61 Casten Drive in Bridgeton, Missouri. The Bishop property is located approximately 0.1 miles from the Landfill boundary.

15.     Plaintiff Melissa Mitchell is a Missouri citizen who owns real property located at 12758 San Clemente Drive in Bridgeton, Missouri. The Mitchell property is located approximately 0.6 miles from the Landfill boundary.

16.     Plaintiff Matt Voss is a Missouri citizen who owns real property located at 13852 Ferguson Lane, Bridgeton, MO, including a landscape business owned and operated by Mr. Voss, Bluegrass Lawncare of St. Louis, L.L.C., d/b/a Bluegrass Landscape & Snow Management. The Bluegrass Lawncare property is located approximately 0.9 miles from the Landfill boundary.

17.     Plaintiffs' properties are located near the Landfill and are contaminated with radioactive materials in excess of normal background.

18.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages including damages to their property and the loss of use and enjoyment thereof.

**Defendants**

19.     The defendants in this lawsuit are categorized into three groups, namely Landfill Owner Defendant, Landfill Operator Defendants (collectively "Landfill Defendants"), and Radioactive Waste Disposer Defendant:

       A.     Landfill Owner Defendant:

           i.     Bridgeton Landfill, LLC, which owns the Bridgeton and West Lake Landfills.

       B.     Landfill Operator Defendants:

           i.     Republic Services, Inc., which owns, oversees, and directs the

4

environmental decisions and conduct of Bridgeton Landfill, LLC and Allied Services, L.L.C., and operates the Bridgeton and West Lake Landfills; and

ii.   Allied Services, L.L.C., which operates Bridgeton and West Lake Landfills.

C.   Radioactive Waste Disposer Defendant:

i.   Cotter Corporation, which owned and disposed of the hazardous, toxic, carcinogenic, radioactive wastes at the Landfill.

20.   Republic Services, Inc. ("Republic") is a Delaware corporation with its principal place of business in the State of Arizona that carries on continuous and systematic business activities within the State of Missouri.

A.   Republic describes itself as "the second largest provider of services in the domestic non-hazardous solid waste industry, as measured by revenue as well as a Fortune 500 company, publicly traded on the New York Stock Exchange (NYSE; RSF)."[1] Despite Republic's record of violations and the widespread injuries resulting from Republic's conduct, Republic promises the public that it lives by "high environmental and sustainability standards."[2] Republic has engaged in extensive professional public relations efforts to downplay the significance of the problem, and their misleading statements can only be characterized as mere "puffery."

B.   Republic's presence in Missouri is immense, servicing more than 300 cities

---

[1] https://www.republicservices.com/about-us.
[2] http://www.republicservices.com/customer-support/facilities.

and towns throughout the state, including many in St. Louis County.[3] Republic continuously and systematically avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here. Republic is responsible for promulgating and enforcing environmental and health and safety policies and procedures to its subsidiaries, which in this case they failed to adequately do.

C.      This lawsuit arises out of damages that resulted from Republic's acts and omissions within the State of Missouri. Since 2008, Republic and its subsidiaries have maintained daily operational and managerial control over the management and environmental decisions of the Bridgeton and West Lake Landfills, decisions which gave rise to the violations of law and damage to property alleged in this Complaint. Republic did so directly and through its subsidiaries Allied Services, LLC, Bridgeton Landfill LLC, and Rock Road Industries, Inc.

21.     Allied Services, LLC ("Allied"), a Delaware limited liability company with its principal place of business in the state of Arizona, is a wholly-owned subsidiary of Republic Services, Inc., that continuously and systematically conducts business in the State of Missouri under its own name and under the fictitious name "Republic Services of Bridgeton."

A.      Allied conducts daily operations of the Bridgeton Landfill and the West Lake Landfill.

B.      Allied regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits

---

[3] https://www.republicservices.com/locations/missouri.

6

tried here.

C.     This lawsuit arises out of damages that resulted from Allied's acts and omissions within the State of Missouri. Since 2008, Allied has maintained daily operational and managerial control over the management and environmental decisions of the Bridgeton and West Lake Landfills, decisions which gave rise to the violations of law and damage to property alleged in this Complaint.

D.     Allied has also promulgated environmental and health and safety policies and procedures to its subsidiaries, which in this case they failed to adequately do.

22.     Bridgeton Landfill, LLC formerly "Laidlaw Waste Systems" ("Landfill Owner"), is a Missouri limited liability company with its principle place of business in the State of Missouri. It continuously and systematically conducts business activities in the State of Missouri.

A.     Upon information and belief, Bridgeton Landfill, LLC owns the Bridgeton Landfill and the West Lake Landfill.

B.     Bridgeton Landfill has continuously and systematically availed itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried here.

C.     This lawsuit arises out of damages that resulted from Bridgeton Landfill's acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of Bridgeton Landfill, LLC, which gave rise to the violations of state law and damages to property alleged in the Complaint.

  D. Upon information and belief, since 1988, Bridgeton Landfill has owned, operated and maintained daily operational and managerial control over the management and environmental decisions of the Bridgeton Landfill and the West Lake Landfill, which gave rise to the violations of law and damage to property alleged in this Complaint.

23. Cotter Corporation is a Colorado corporation with its principal place of business in Englewood, Colorado, which currently operates as a subsidiary of General Atomics, Inc., a California corporation.

  A. Cotter continuously and systematically carried on business activities in the State of Missouri in its own name and through its parent company ComEd.

  B. This lawsuit arises out of damages that resulted from Cotter's conduct, including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of Cotter, which gave rise to the violations of law and damages to property alleged in the Complaint.

## IV. FACTS

### Radioactive Wastes

24. Ounce for ounce, radioactive isotopes are the most toxic materials known to man.

25. Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

26. Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other

8

material. When radiation energy interacts with other material, it causes a process called ionization[4] which can damage chemical structures. When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

27.    People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body. Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin. The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

28.    One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the biological effects can still be gravely serious. The second characteristic is that there are latent biological effects of radiation.

29.    The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. This can be damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

---

[4] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions. Ionizing radiation has enough energy to cause changes in atoms through a process called ionization. Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans. Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes." https://www.epa.gov/radiation/radiation-health-effects.

30.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase. These genetic mutations can be passed down to a person's offspring even generations later. These injuries include birth abnormalities and cancer.

31.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment. As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

32.     Radium-226 has a half-life of 1,600 years. Radium-226 eventually decays to lead-210 and polonium-210. This means that as the radium-226 decays, it increases the lead-210 and polonium-210 at the Landfill and in the surrounding environment. Furthermore, half of the hazardous, carcinogenic radium-226 currently contaminating the West Lake Landfill will still remain as a grave problem even after 1,000 years from now if it is not physically removed. This is described in the scientific literature as follows:

> Importantly, because the concentrations of short-lived radionuclides will progressively increase, the radioactivity at the site will likewise increase for the foreseeable future. For example, according to NRC, if the present day activity of $^{230}$Th is estimated to be 100 times that of $^{226}$Ra, then the alpha activity due to $^{226}$Ra decay will increase fivefold over present levels in 100 years, nine-fold in 200 years, and

35-fold in 1000 years.[5]

33.     According to the EPA's proposed corrective action plan of February 2, 2018, the risks related to radioactive materials at the Landfill will "increase in the future due to ingrowth of radium-226 from its parent thorium-230. These risks will increase according to the radioactive decay of thorium and will result in peak risks in approximately 9,000 years."

## Radioactive Waste in the St. Louis Area

34.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project. The Manhattan Project was the U.S. research project designed to develop the first nuclear weapons.

35.     This downtown St. Louis facility was known as the St. Louis Downtown Site (the "SLDS") and was used to process uranium.

36.     In the late 1940s, the Manhattan Project acquired a 21.7-acre tract of land near Lambert airport to store the hazardous, toxic, carcinogenic radioactive wastes from the uranium processing operations at the SLDS. The storage site near the airport is now referred to as the St. Louis Airport Site or SLAPS ("SLAPS").

37.     Radioactive wastes accumulated at SLAPS. These hazardous, toxic, carcinogenic, radioactive waste materials included pitchblende raffinate residues, radium-bearing residues, barium sulfate cake, Colorado raffinate residues, and were stored at SLAPS along with contaminated scrap.

38.     In the late 1960's, private companies purchased and assumed responsibility for the radioactive wastes stored at SLAPS.

---

[5] Criss (2013) at 2-3 (citations omitted).

39.     The hazardous, toxic, carcinogenic radioactive wastes that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site") (part of this site later became the Hazelwood Interim Storage Site ("HISS").

40.     In 1969, Cotter Corporation purchased and assumed responsibility for the radioactive wastes that were stored at the Latty Avenue Site. Plaintiffs claims do not arise from the use of radioactive material at the Latty Avenue Site.

41.     From 1969 to 1973 Cotter dried and shipped some of these wastes to their plant in Canon City, Colorado.

42.     Included in the radioactive wastes that Cotter purchased were approximately 8,700 tons of leached barium sulfate residues ("LBSR"). It did not make commercial sense for Cotter to ship these wastes to its plant in Colorado.

43.     Cotter made multiple requests to dispose of the LBSR at a government operated radioactive material site in Weldon Springs, Missouri. The Atomic Energy Commission denied all of Cotter's requests.

44.     Cotter inquired the Atomic Energy Commission about the possibility of on-site burial at the Latty Avenue Site. After the Atomic Energy Commission detailed the processes and showings Cotter would have to undertake and make prior to any possible permission for on-site burial at Latty Avenue, Cotter abandoned the option of on-site burial.

45.     Cotter obtained a rough market price of costs exceeding $2 million for disposal of the LBSR at a private facility, but Cotter did not spend the $2 million to properly dispose of the material.

46.     Cotter also investigated other means of disposal of the LBSR including, but not

limited to, providing it to a property owner to fill a low area in a floodplain. This ███████

████████████████████████████████████████████████████████████

████████

47.     After years of seeking legal and proper disposal options for the LBSR, in 1973, Cotter mixed the 8,700 tons of LBSR with contaminated soil at the Latty Avenue Site. Despite knowing that these materials were radioactive, Cotter Corporation caused to be dumped, and the Landfill Defendants accepted, over 46,000 tons of the radioactive soil mixture at the West Lake and/or Bridgeton Landfills (collectively referred to as he "Landfill"), which was not permitted to receive such wastes.

48.     Cotter did not consult with, contact, or get permission from the AEC or St. Louis County Health Department before the wastes were disposed at the Landfill.

49.     Upon information and belief, despite knowing that Cotter was trying to dispose of dangerous radioactive materials for which the Landfill was not permitted to accept, the radioactive waste mixture was used by Defendants as daily cover for the Landfill. Defendants dumped the radioactive wastes into the Landfill and intentionally spread these wastes over a large area.

50.     Since then, that radioactive waste material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people. These everyday St. Louisans now find their lives disrupted, their homes contaminated, their businesses upended, and their properties devalued.

51.     The scientific literature summarizes this dumping as follows:

> In 1973, 8700 tons of radionuclide-bearing "leached barium sulfate" was allegedly dumped in an unlined Landfill in Bridgeton, MO that was not licensed to receive radwaste. This report finds that 1) the chemical and physical character of the radioactive materials has not been adequately characterized, and barium sulfate is probably not a

major constituent; 2) the alpha and beta emissions of this material will increase 10x to 100x over present levels, reaching maximum activity in about 9000 years; 3) the Landfill has no protective barriers and a proximal subsurface fire; 4) the site has several hydrologic and geologic risk factors that magnify its unsatisfactory location in a populated area; 5) nuclear material has been in contact with percolating waters and with a fluctuating water table; 6) groundwaters contaminated with radionuclides have migrated far from the original location of disposal; 7) background levels of radiation have been overstated, while other risks have been underestimated ....[6]

## Characterization of Radioactive Wastes Dumped at the Landfill – The Atomic Energy Act and Price Anderson Act are Inapplicable

52.     Plaintiffs do not allege any causes of actions arising under any laws of the United States.[7]

53.     Plaintiffs' claims do not fall within the scope of the Price-Anderson Act. The Landfill is not and has never been a licensed nuclear facility. The Landfill has never received a license to possess, transport, or dispose of any radioactive wastes. Defendants have never entered into an indemnification agreement with the United States government under 42 U.S.C. § 2210 with respect to the complained activities. Plaintiffs' claims are freestanding state law claims concerning traditional state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification.

54.     Defendant Bridgeton Landfill, LLC previously declared that the Price-Anderson Act does not apply to them because the West Lake Landfill is not a licensed nuclear facility: "Count One, arising under the Price-Anderson Act, is wholly inapplicable to Rock Road and Bridgeton Landfill, as the West Lake Landfill is not a nuclear facility subject to licensing by the

---

[6] Criss (2013) at 1.
[7] See this Court's May 8, 2019, Memorandum and Order (Doc. No. 51) which held that the PAA does not apply to Plaintiffs' claims.

nuclear Regulatory Commission."[8]

55.     Plaintiffs' claims do not amount to a "nuclear incident." A "nuclear incident" requires three elements: (1) any occurrence, including an extraordinary nuclear occurrence, (2) causing bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, and (3) *arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material*. See 42 U.S.C. § 2014(q) (emphasis added).

56.     Plaintiffs' claims do not and could not arise out of or result from hazardous properties of "source, special nuclear, or byproduct material."

57.     Testimony by Cotter establishes that the wastes dumped at the Landfill are not "source material":



─────────────────────
[8] Defendant Bridgeton Landfill, LLC's Memorandum in Support of Motion to Dismiss (Doc 15), *Adams v. MI Holdings, Inc*. Case No. 4:12-cv-00641-JCH.
[9] Hamrick Deposition, Volume I, July 25, 2019, at page 37.
[10] Hamrick Deposition, Volume II, July 26, 2019, at page 28.
[11] Hamrick Deposition, Volume I, October 5, 2016, at page 174.



58.     At the time of the outrageous, reckless, and negligent acts that form the basis for this lawsuit occurred, the radioactive wastes at issue were not "byproduct material".

59.     The tailings or wastes produced by the extraction or concentration of uranium or thorium for any ore processed primarily for its source material were not included in the definition of "byproduct material" until the passage of the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA).

60.     Defendant's disposal and acceptance of radioactive wastes in 1973 occurred five years before the passage of the UMTRCA in 1978, which did not have retroactive effect.[17] This is

---

[12] *Id*. at 112.

[13] *Id*. at 190.

[14] *Id*. at 191.

[15] Hamrick Deposition, Volume II, October 6, 2016, at page 23.

[16] *Id*. at 54.

[17] See *Dailey v. Bridgeton Landfill, LLC, et al*.; Case No. 4:22-cv-00116-CDP; Doc No. 76. ("Given that there is no retroactive effect to Title II of UMTRCA, the mill tailings wastes plaintiffs claim Cotter Corporation transported and disposed of in 1973 were not "source, special nuclear, or byproduct material" at the time of the alleged occurrence in this action. The occurrence therefore did not and could not arise out of or result from hazardous properties of such material. Accordingly, there was no "nuclear incident" as defined to bring this action under the PAA.").

confirmed by Cotter's testimony:



61.     Neither the Atomic Energy Act nor the Price-Anderson Act apply to the indisputably hazardous, toxic and carcinogenic wastes at issue in this Second Amended and Supplemental Complaint.

### **The Landfill**

62.     The West Lake Landfill is situated on about 200 acres at 13570 St. Charles Rock Road, in the City of Bridgeton. The Missouri River lies about one and one-half miles to the north and west of the Landfill. A shallow aquifer lies beneath the West Lake Landfill and surrounding neighborhoods.

63.     Originally used for agriculture, the land became a limestone quarrying and crushing operation in 1939.

64.     Beginning in the early 1950s, portions of the quarried areas and adjacent areas were used to dispose of municipal refuse, chemical wastes, industrial solid wastes, and

---

[18] Hamrick Deposition, Volume I, October 5, 2016, at page 172.
[19] Hamrick Deposition, Volume I, July 25, 2019, at page 113.

construction/demolition debris.

65.     The Landfill was never designed to be an adequate storage or disposal site for radioactive materials, nor was it ever licensed by the State of Missouri as such. Despite the Landfill not being properly designed to receive radioactive materials, the Defendants disposed of and accepted hazardous, toxic, carcinogenic, radioactive wastes and spread them around the Landfill.

66.     The inadequacies of the Landfill itself are described in the scientific literature as follows:

> Although the West Lake Landfill contains significant amounts of long-lived radiotoxic wastes such as those contained in federally licensed commercial radioactive waste Landfills, it meets virtually none of legal requirements governing shallow radioactive waste disposal to prevent off-site migration.[20]

67.     The data collected on and around the Landfill documents radioactive contamination of soil, water, and air.

> Onsite [226]Ra concentrations in soils as high as 21,000 pCi/g were measured, compared to estimated background levels of 2 pCi/g. Elevated radium contents above the EPA's MCL of 5 pCi/l are also widespread in both the alluvial and bedrock aquifer within about 1500 feet of Areas 1 and Area 2. Airborne surveys established that external radiation levels exceeding 100μR/hr, while distal samples were <10 μR/hr. Levels recorded one meter above Area 2 were as high as 3-4 mR/hr, or as much as 400x higher than background. NRC reports that the subsequent addition of soil cover and construction debris to Areas 1 and 2 diminished these levels several fold.[21]

68.     Other toxic and hazardous materials are expected to have been released via the air pathway, in addition to the radioactive materials. This phenomenon contributes to the damages complained of herein.

---

[20] Kaltofen (2016) at 104.
[21] Criss (2013) at 2 (citations omitted).

69.     The Landfill stopped accepting waste on December 31, 2004 and is now used as a transfer station for municipal wastes.

70.     The Landfill waste mass encompasses approximately 52 acres with approximately 240 feet below the ground's surface and a total waste thickness of 320 feet.

71.     Upon information and belief, since at least 1988, the Landfill Defendants have owned and/or operated the Bridgeton and West Lake Landfills.

## Radioactive Waste at the Landfill

72.     Defendants caused or contributed to improper handling, storage, and disposal of an estimated 500,000 cubic yards of radioactive wastes in the Landfill. As a result, about 15 acres of the West Lake Landfill are filled with radioactive waste at depths up to 20 feet.

73.     Upon information and belief, Defendants who operated the Landfill used the radioactive waste mixed with radioactive soil as daily cover in its Landfill operations thereby spreading the waste throughout the Landfill.

74.     Defendants did not take necessary safety precautions when disposing of and handling the radioactive wastes and radioactive soil to prevent off-site contamination.

75.     The staff of the Landfills were neither qualified, nor trained to handle or dispose of radioactive wastes in a safe manner.

76.     The Landfill was not intended, nor designed to contain radioactive wastes. In reality, the Landfill is a chaotic pile of debris covered by unmanaged "natural vegetation, surrounded by a fence with radioactive [warning] signs." Given the significant design and operational deficiencies, experts contend that the West Lake Landfill is not even unsuitable for ordinary domestic waste.[22]

---

[22] Criss (2013) at 4.

**The Fire**

77.     The Landfill has experienced problems with subsurface fires throughout its operational history. Despite having past experiences with subsurface fires, sufficient precautionary measures were not implemented to prevent future fires or to protect the radiologically contaminated areas from being affected.

78.     Upon information and belief, Defendants discovered high temperatures in several monitoring wells. Upon information and belief, Defendants continued with aggressive gas extraction methods exacerbating the underground fire and enabling it to spread uncontrolled. Defendants finally reported to authorities that the Landfill was experiencing high temperatures on extraction wells evidencing a subsurface smoldering event.

79.     Since then, the smoldering has intensified into a spreading subsurface fire evidenced by surface soil settlement, increased odors, elevated hydrogen levels, and high temperatures. High temperatures and smoke caused by the fire could mobilize radionuclides into the air and ultimately into soil, surface water, ground water.

80.     Due to the fact that the radioactive material was used as daily cover around the Landfill, it is more likely than not that some fire has already consumed radioactive material. However, if the subsurface fire reaches the radioactively impacted portions of the Landfill, the hot gases from the fire will likely cause fissures in the overburden material. These fissures may allow additional quantities of radioactive radon gas to escape the Landfill and become deposited as lead-210 onto properties in the class boundary as it decays.

81.     A subsurface fire in the radioactively contaminated areas would be expected to create increased pressure conditions within the Landfill and force out entrained radioactive gases, including radon which is extremely toxic to breathe. A subsurface fire may be present in the

radioactively contaminated areas for a long period of time before it is detected, because the only apparent means to detect a subsurface smoldering event after closure is through annual visual inspections.

82.     Another effect of a subsurface fire or smoldering event would be increased leachate production which has been observed in the Bridgeton Landfill from condensation of large amounts of steam.

83.     The literature describes the risk of the West Lake underground fire as follows:

> An underground fire is currently ongoing in the municipal Landfill (OU-2) that is immediately south of Area 1 of OU-1. Such fires can burn for years, creating high underground temperatures, and releasing carbon monoxide, dioxins, VOCs and other noxious chemicals, and particulates into air. Numerous people who reside near the Landfill complained about odor and health problems at the January 17, 2013 public meeting in Bridgeton. Risks for adjacent, radionuclide-bearing OU-1 include but are not restricted to the following 1) fire can spread from OU-2 into OU-1, particularly because demolition and construction Landfills are known to have much higher risk than municipal Landfills; 2: subterranean fires can result in Landfills collapse, landslides and slumping, endangering personnel and exposing dangerous materials to the surface; 3) Landfill fires have high explosion risk because of methane, gas cylinders, and drums; 4) high temperatures and smoke could mobilize radionuclides into surface water, ground water and air.[23]

84.     There are at least two human exposure risk pathways that would exist from a subsurface smoldering event or subsurface fire reaching the radioactive materials. The first is the risk of people being subjected to increased air exposures to contaminants such as breathing in radon gas, radon-226. As airborne concentrations of radon gas increase, so would the risk to the neighboring population of breathing in radon gas and developing injuries such as lung cancers. Additionally, as radon gas decays it will become deposited onto people's property and in their

---

[23] Criss (2013) at 4-5 (citations omitted).

homes as radioactive lead-210 and polonium-210 which would subject people to increased risk of internal exposure to radioactive materials. The second pathway is increased leachate production that could further move contaminants and radioactive materials into the groundwater.

85.     Despite these risks, the Defendants have allowed the subsurface fire to spread uncontrolled.

86.     From the start of the subsurface smoldering event and throughout the subsequent fire, Plaintiffs have regularly encountered noxious, putrid, and offensive odors on his property coming from the Landfill, which diminishes quality of life and results in lost property value.

**The Spread of Defendants' Radioactive Waste to Off-Site Businesses and Homes**

87.     As stated herein, Defendants have violated numerous standards for protection against radiation promulgated by the state of Missouri. Defendants' negligent handling, storage, and disposal of radioactive wastes and radioactive soil as daily cover caused dangerous contaminants to be deposited in several areas throughout the Landfill site and to be highly susceptible to off-site migration of radioactive materials including radon gas, radioactive particles, and radioactively-contaminated groundwater.

88.     An example of water impacts of the Landfill will put this in perspective. Every day, the Landfill generates about 150,000 gallons of contaminated hazardous liquid waste. In a doomed attempt to capture that waste, the Landfill Defendants installed a leachate collection system. But the leachate collection system itself was inadequate and has resulted in spills, releases, and leaks that have contributed to the groundwater and surface water contamination in the area.

89.     Radiological and organic contamination was also detected in trees adjacent to and off-site from the Landfill. The presence of radioactive contamination in the trees resulted from the uptake of off-site contamination from the Landfill.

90.     Recent studies of the Landfill area document radioactive radon gas emissions from the Landfill are falling out and contaminating soil. Kaltofen reported the following:

> Levels of $^{210}$Pb in key samples were well above background activies, and were significantly out of secular equilibrium with other members of the uranium decay chain. This is strong evidence that the $^{210}$Pb originated by decay of short-lived, fugitive radon gas that escaped the Landfill.[24]

91.     Importantly, wherever lead-210 occurs, it will decay to polonium-210, creating an additional dose, as a matter of the laws of physics.

92.     In addition, recent studies of surface water runoff from the Landfill, particularly after heavy rains, document radioactive contaminated surface water runoff to off-site properties.[25]

93.     Critical to the legacy of radioactive particles contaminating the homes and communities surrounding the Landfill is that:

A.     The radioactive contamination has gone off-site; and

B.     The off-site radioactive contamination has the fingerprint (or profile) of the hazardous, toxic, carcinogenic radioactive wastes Cotter purchased in 1969.

94.     Defendants have a long and consistent history of consciously disregarding the regulations for the control of radiation in Missouri by:

A.     failing to make such surveys as are reasonably necessary to comply with the regulations;

B.     failing to post adequate warning signs as required by the regulations;

C.     failing to obtain a specific license for the handling of radioactive materials

---

[24] Kaltofen (2016) at 110.
[25] EPA Finds Radiation in West Lake Landfill Runoff, CBS St. Louis, May 26, 2016, http://stlouis.cbslocal.com2016/05/26/epa-finds-radiation-inwestlake-landfill-runoff.

and wastes;

D.      failing to adequately monitor or control its offsite effluent by air and water;

E.      failing to provide dosimetry to workers and more than occasional visits by members of the general public to the site;

F.      failing to have an adequate or proper radiation protection program for its workers, despite knowledge of the significant potential for those workers to be exposed to material emitting gamma, beta, alpha radiation;

G.      allowing off-site migration of the radioactive materials, resulting in a release to an unrestricted area;

H.      allowing excessive radon emanation from the landfill;

I.      allowing unmonitored offsite migration of contaminated surface waters without a specific license;

J.      failing to maintain adequate waste exposure records and reports;

K.      failing retain and employ qualified radiation protection experts;

L.      failing to supply former workers with a summary of their radiation dose;

M.       failing to see that all work with radioactive materials is carried under conditions which will minimize the possibility of spread of radioactive materials;

N.      failing to monitor the workplace and prevent worker or visitors' clothing from becoming contaminated with radioactive materials;

O.      failing to require third parties who were disposing of radioactive material at the site to obtain a specific license;

24

P.       disposing and allowing the disposal of radioactive waste materials by dumping or burial at a site not approved by the Department of Health;

Q.       failing to have an accurate accounting for all radioactive materials at the site; and

R.       failing to have records which show the amount of radioactive material received, transferred, decayed in storage, disposed of, and other information as may be necessary to account for the difference between the amount of radioactive material received or produced and the amount on hand.

95.      Defendants essentially violated every Missouri regulation related to radiation exposure.

96.      Due to risk of gamma radiation exposure, EPA has directed Republic to cover portions of the landfill with six inches of fill to protect workers and innocent members of the general public who will be exposed to gamma radiation if they are in that area.

97.      This zone of excessive gamma radiation was identified in 1978 during a surveillance flight by the NRC. Despite being informed of this zone of excessive gamma radiation, Defendants did nothing.

98.      To this day, Defendants, despite orders from the EPA, continued to disregard the presence of radioactive materials at the landfill, including by failing to protect workers and visitors from radiation, including at the transfer station.

99.      The only time Defendants takes any action to remediate or protect workers or the public from radioactive wastes is when ordered to do so by governmental body.

**Concealment of Facts Related to Risk**

100.     Republic and other Defendants through their silence have reassured government

officials, the public and Plaintiffs that the Landfill has not contaminated nearby properties. In particular, Republic and its representatives, as well as its professional public relations firm(s), have made misrepresentations that were meant to assure Plaintiffs that:

A.     Any suspicion of off-site contamination from the Landfill are merely rumors "being spread by alarmists."[26]

B.     Its activities "should reassure the community that they are safe from and not being exposed to any risk from groundwater beneath West Lake Landfill."[27]

C.     The Landfill's neighbors, including the Plaintiffs "can rest assured that they are safe."[28]

D.     The fire and Landfill are both at a "managed state."[29]

E.     The waste at the Landfill presents no danger to public health.[30]

**Defendants' Radioactive Particles Contaminated the Plaintiffs' Property**

101.    John C. Kitchin, Jr.'s, Sharon Bishop's, Melissa Mitchell's and the Bluegrass Lawncare of St. Louis properties (collectively, Plaintiffs' Property) are contaminated by radioactive material in excess of normal background.

102.    Samples taken on and around Plaintiffs' Property confirm an elevated presence of radioactive particles above background.

103.    Plaintiffs' Property is in close proximity the Landfill. This proximity puts the Plaintiffs' Property in the direct path of radioactive air emissions, radioactive particles distributed

---

[26] Jacob Barker, Radium above federal guidelines in groundwater near West Lake at 2, St. Louis Today, Dec. 17, 2014.
[27] *Id.*
[28] Jacob Barker, Frustration with EPA handling of West Lake growing at 5, St. Louis Today, Jan. 3, 2015.
[29] Frustration with EPA handling of West Lake growing, Jacob Barker, St. Louis Today, January 3, 2015 at p. 5.
[30] *Id.*

by the wind blowing such contamination off the site in dirt and dust, radon gas, and frequent offensive odors; all of which emanate from the Landfill.

104.    The Kaltofen (2016) published scientific paper identified "strong evidence of short lived fugitive radon gas that escaped from the landfill."[31] These air emissions fall out to soil and dust as $^{210}$Pb, a highly radioactive isotope.

105.    It is also clear that radioactive material will be distributed from the Landfill "by surface water and winds."[32] The surface water runoff threat is heightened during periods of high rainfall and flooding, and has been documented.[33]

106.    Frequent offensive odors from the Landfill are experienced by Plaintiffs.

107.    The radioactive wastes, which are hazardous, toxic, carcinogenic, that have polluted the Plaintiffs' Property and continue to threaten to further pollute Plaintiffs' Property match waste fingerprint (or profile) of the hazardous, toxic, carcinogenic radioactive wastes dumped in the Landfill.

108.    This radioactive contamination on Plaintiffs' property migrated from the Landfill. The contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

109.    Radioactive contamination of Plaintiffs' Property and frequent offensive odors render Plaintiffs' Property unfit for normal use and enjoyment, and destroys its fair market value.

110.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the

---

[31] Kaltofen (2016) at 111.
[32] Kaltofen (2016) at 104.
[33]    EPA Finds Radiation in West Lake Landfill Runoff, CBS St. Louis, May 26, 2016, http://stlouis.cbslocal.com2016/05/26/epa-finds-radiation-inwestlake-landfill-runoff.

contamination and to prevent and eliminate further contamination.

## V.    CLASS ACTION ALLEGATIONS

111.    Plaintiffs file this class action Complaint pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all Missouri citizens who are owners of residential property and who are residents in the vicinity of the West Lake Landfill as detailed below.

112.    Plaintiffs bring this action on behalf of themselves and the Class against Defendants to recover damages to their property and to obtain injunctive relief in the form of a total and complete cleanup of the contamination and to prevent and eliminate further contamination.

113.    This action is maintainable as a class action and should be certified pursuant to Federal Rules of Civil Procedure 23(a)-(c).

114.    The proposed class for property damage claims is defined as follows ("Property Damage Subclass"):

**All Missouri citizens who currently own real property within the 11.0 square mile geographic region in the vicinity of the West Lake Landfill, as shown in the map in Figure 1 below, bounded by the Missouri River to the west and a line south of Rt. 370 to the north, with the eastern boundary following a southerly line across Old St. Charles Rd. before crossing the residential area lying to the south of the landfill.**



**Figure 1. Class Area**

"Own," in the context of the class and subclass definitions, includes those who hold any fee simple estate or life estate.

115.   The proposed class for medical monitoring is defined as follows ("Medical Monitoring Subclass"):

> **All Missouri citizens who currently reside, or have resided since 1973, on a property within the 11.0 square mile geographic region in the vicinity of the West Lake Landfill, as shown in the map in Figure 1 above, bounded by the Missouri River to the west and a line south of Rt. 370 to the north, with the eastern boundary following a southerly line across Old St. Charles Rd. before crossing the residential area lying to the south of the landfill.**

116.   Excluded from the Property Damage Subclass and the Medical Monitoring Subclass (collectively, the "Class") are Defendants and their officers, directors, and employees, as

well as employees of any of Defendants' subsidiaries, affiliates, successors, or assignees. Also excluded are the immediate family members of the above persons. Also excluded is any trial judge who may preside over this case. Also excluded from the class are persons who previously entered into valid and enforceable settlements of property damage claims related to the claims asserted herein with any of the Defendants.

117.    The requirements for maintaining this action as a class action are satisfied, as set forth immediately below.

118.    The proposed Classes are so numerous that the individual joinder of all absent class members is impracticable. While the exact number of absent Class Members is unknown to Plaintiffs currently, it is ascertainable by appropriate discovery and Plaintiffs, upon information and belief, allege that the proposed Class includes more than twenty-five local members. The requirement of numerosity is therefore satisfied.

119.    Common questions of law or fact exist as to all proposed Class Members and predominate over any questions which affect only individual members of the proposed Classes, and the answers to which will drive classwide resolution of Plaintiffs' claims asserted herein. These common questions of law or fact include:

    a.    Whether Defendants engaged in the abnormally dangerous activity of storing radioactive waste;

    b.    Whether Defendants unreasonably and unlawfully stored radioactive materials at the West Lake Landfill;

    c.    Whether Defendants created and continue to create a high degree of risk of harm to Plaintiffs' and Class Members' property;

    d.    Whether Defendants have intentionally, unreasonably, negligently,

recklessly, willfully, wantonly and maliciously allowed the emission of radon gas and radioactive particles onto and around Plaintiffs' and Class Members' property;

e.   Whether Defendants' conduct or omissions affecting land surrounding the West Lake Landfill resulted in Plaintiffs' and Class Members' loss of use and enjoyment of their property;

f.   Whether the loss in property value suffered by Plaintiffs and Class is a result of Defendants' actions;

g.   Whether Plaintiffs and Class are entitled to damages; and

h.   Whether Defendants' conduct rises to the level of willfulness so as to justify punitive damages.

120.   The claims of the Plaintiffs are typical of the claims of the Classes. Plaintiffs and all Class Members own or reside on land located near the location where Defendants recklessly dumped radioactive waste.

121.   Plaintiffs will fairly and adequately represent the interests of the members of the Class. Plaintiffs have no interest adverse to the interests of the members of the Class. Plaintiffs have retained competent attorneys who have experience in class action litigation.

122.   Defendants have acted or refused to act on grounds that apply generally to the Class as discussed herein, such that final injunctive relief is appropriate for the Class as a whole.

123.   Unless a class-wide injunction is issued, Defendants will continue to allow contamination of the properties of Plaintiffs and Class and will continue to violate Missouri law resulting in harm to thousands of Missouri citizens.

124.   A class action is a superior method for the fair and efficient adjudication of this

controversy. The adjudication of a separate action by individual members of the classes would create a risk of (a) inconsistent or varying adjudications with respect to individual members of the class; or (b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Upon information and believe each of the Class Members suffered the same sort of damages and injuries as those suffered by the Plaintiffs, due to the contamination of their property by radioactive waste from the Landfill. In addition, this class action will allow for the resolution of identical claims in an efficient manner that avoids fragmented litigation in which inconsistent results could occur.

125.    Questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members. There is no special interest in the members of the classes individually controlling the prosecution of separate action. The expense and burden of individual litigation make it impossible for the Class Members individually to address the wrongs done to them.

126.    There will be no difficulty in managing this lawsuit as a class action. Evidence relating to Defendants' alleged violations will be applicable to all members of the class; there are accepted means for notifying class members who have suffered injuries and damages described herein.

127.    All of the class members are citizens of Missouri.

128.    The principal injuries resulting from the conduct of the Defendants were incurred in Missouri.

129.    No class action asserting similar factual allegations has been filed against any of the defendants in the preceding three years.

130.    For these reasons, this case is maintainable as a class action pursuant to Rule 23(a)(1)-(4), Rule 23(b)(2), and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

## COUNT I – TRESPASS
### (Brought individually and on behalf of the Property Damage Subclass)

131.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

132.    Plaintiff John C. Kitchin, Jr. owns and controls the Kitchin property located at 12990 St. Charles Rock Road in Bridgeton, Missouri.

133.    Plaintiff Sharon Bishop owns and controls the Bishop Property located at 61 Casten Drive in Bridgeton, Missouri.

134.    Plaintiff Melissa Mitchell owns and controls the Mitchell property located at 12758 San Clemente Drive in Bridgeton, Missouri.

135.    Plaintiff Matt Voss owns and controls the Bluegrass Lawncare Property located at 13852 Ferguson Lane, Bridgeton, Missouri.

136.    Landfill Defendants own and control property located at the Bridgeton and West Lake Landfills (the "Landfill"), which is in close proximity to Plaintiffs' property.

137.    Landfill Defendants store and/or transport radioactive materials and other toxic and hazardous wastes on their property.

138.    Cotter purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes. Cotter intentionally, maliciously, and wantonly disposed of radioactive wastes at the Landfill, a facility unfit to handle such wastes.

139.    Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

140.    Defendants have caused these radioactive materials to migrate from the Landfill and contaminate Plaintiffs' property. This is a direct interference with Plaintiffs' property.

141.    Defendants willfully, wantonly, and maliciously caused the emission of radon gas, and radioactive particles onto and around Plaintiffs' property through their Landfill operations.

142.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

143.    The migration of radon gas and radioactive particles from the Landfill onto Plaintiffs' property has resulted and continues to result in direct physical interference with Plaintiffs' property. Such contamination is incompatible with the normal use and enjoyment of Plaintiffs' Property.

144.    Plaintiffs did not give Defendants permission or consent to interfere with his property in this manner. Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store hazardous, toxic, carcinogenic, radioactive wastes.

145.    The contamination of Plaintiffs' property with radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

146.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT II – PERMANENT NUISANCE
**(Brought individually and on behalf of the Property Damage Subclass)**

147.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

148.    Plaintiff John C. Kitchin, Jr. owns and controls the Kitchin property located at

34

12990 St. Charles Rock Road in Bridgeton, Missouri.

149.   Plaintiff Sharon Bishop owns and controls the Bishop Property located at 61 Casten Drive in Bridgeton, Missouri.

150.   Plaintiff Melissa Mitchell owns and controls the Mitchell located at 12758 San Clemente Drive in Bridgeton, Missouri.

151.   Plaintiff Matt Voss owns and controls the Bluegrass Lawncare Property located at 13852 Ferguson Lane, Bridgeton, Missouri.

152.   Landfill Defendants own and control property located at the Bridgeton and West Lake Landfills (the "Landfill"), which is in close proximity to Plaintiffs' property.

153.   Defendants unreasonably and unlawfully stored and used radioactive materials at the Landfill, which adjoins Plaintiffs' property.

154.   The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

155.   The Landfill and the radioactive waste that the Landfill contains are a permanent construction that is necessarily injurious to Plaintiffs as installed. It is not practical or possible to abate the presence of the Landfill or the radioactive waste stored there.

156.   Operating an unlicensed radioactive hazardous waste dump in a populated area is a nuisance per se.

157.   Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property. Such contamination is incompatible with the normal use and enjoyment of their property.

158.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

159.    Landfill Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of noxious, offensive odors and various hazardous substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of the property.

160.    Landfill Defendants' continuous and unrelenting noxious odors invading Plaintiffs' property causes inconvenience to Plaintiffs and prevents them from using the property.

161.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

**COUNT III – TEMPORARY NUISANCE**
**(Brought individually and on behalf of the Property Damage Subclass)**

162.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

163.    Plaintiff John C. Kitchin, Jr. owns and controls the Kitchin property located at 12990 St. Charles Rock Road in Bridgeton, Missouri.

164.    Plaintiff Sharon Bishop owns and controls the Bishop Property located at 61 Casten Drive in Bridgeton, Missouri.

165.    Plaintiff Melissa Mitchell owns and controls the Mitchell located at 12758 San Clemente Drive in Bridgeton, Missouri.

166.    Landfill Defendants own and control property located at the Bridgeton and West Lake Landfills (the "Landfill"), which is in close proximity to Plaintiffs' property.

167.    Landfill Defendants unreasonably and unlawfully store and use radioactive

materials at the Landfill, which adjoins Plaintiffs' property.

168.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

169.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property. Such contamination is incompatible with the normal use and enjoyment of their property.

170.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

171.    Landfill Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of noxious, offensive odors and various hazardous substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.

172.    Landfill Defendants' use of the Landfill causes frequent and unrelenting noxious odors to invade Plaintiffs' property and prevents Plaintiffs from using their property.

173.     As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

### COUNT IV – NEGLIGENCE
### (Brought individually and on behalf of the Class)

174.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

175.    Radioactive isotopes are known human carcinogens and are among the most toxic

materials known to man. When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years. Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind. Exposures to radioactive wastes should be as low as is reasonably achievable.

176.    Knowing of the grave dangers posed by these wastes, the Defendants owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

177.    Cotter had a duty to ensure that the radioactive wastes were safely disposed of at an appropriate facility. Cotter breached this duty in failing to ensure that the radioactive wastes were safely disposed of at an appropriate facility. Cotter negligently disposed of these radioactive wastes at a landfill located in a residential area that was not capable of safely and properly disposing of radioactive materials. The Landfill was not properly licensed, nor configured, nor staffed to handle the disposal of radioactive wastes. Upon information and belief, Cotter negligently encouraged the Landfill operators to use the radioactive mill tailings wastes which were mixed with contaminated soil as daily cover.

178.    As a direct and proximate result of Cotter's failure to ensure that the radioactive wastes were properly disposed of at an appropriate facility, Plaintiffs suffered and continue to suffer injury to due to the radioactive contamination of their property, including diminished property value.

179.    The Landfill Defendants owed a duty to the Plaintiffs to operate the Landfill in a safe, legal, and reasonable manner so as not to contaminate and interfere with surrounding properties. The Landfill Defendants owed a duty not to accept radioactive wastes for which they were not licensed or qualified to handle. After accepting radioactive wastes, the Landfill

Defendants had a duty to safely handle, store and/or dispose of the radioactive wastes in order to prevent significant injury to property and persons.

180.    The Landfill Defendants breached their duties not to accept radioactive wastes for which they were not licensed or qualified to handle, to operate the Landfill in a safe, legal, and reasonable manner so as not to contaminate and interfere with surrounding properties, and to safely handle, store and/or dispose of the radioactive wastes in order to prevent significant injury to property and persons.

181.    Landfill Defendants were negligent in the construction, design, operating and maintenance of the Landfill.

182.    Landfill Defendants negligently accepted hazardous, toxic, carcinogenic radioactive wastes when the Landfill was not designed, nor staffed to handle the disposal of radioactive wastes. The negligent design and maintenance of the Landfill by Defendants failed to prevent the release of radon gas and radioactive particles and hazardous and toxic wastes onto surrounding properties in excess of guidelines.

183.    Defendants were negligent in disposing and accepting hazardous, toxic, carcinogenic radioactive wastes at a landfill located in a residential area that was not capable of safely and properly disposing of radioactive materials. The Landfill was not properly licensed, nor configured, nor staffed to handle the disposal of radioactive wastes. Upon information and belief Defendants used the radioactive materials which were mixed with contaminated soil as daily cover.

184.    Upon information and belief, Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiffs' property.

185.    Defendants' negligent use of radioactive wastes mixed with radioactive soil as daily

39

cover spread contamination into a broader area and prevented Defendants and regulators from knowing the location of these dangerous wastes. The negligent use of radioactive materials as daily cover in an unlined Landfill resulted in contamination of the groundwater underlying the Landfill and surrounding properties.

186.   Landfill Defendants were negligent in failing to prevent the subsurface fire. Defendants should have implemented adequate practices with respect to gas extraction to avoid subsurface fires after they initially dealt with problems with smoldering events and increased subsurface temperatures in the 1990's. The subsurface fire along with the resulting noxious odors and increased risk of significant radon gas emissions are a direct and proximate result of the Defendants' negligence in the operation of the Landfill. Such contamination is incompatible with the normal use and enjoyment of the Plaintiffs' Property.

187.   Defendants' negligence throughout the history of the mishandling and improper dumping of radioactive wastes in the Landfill has resulted in repeated releases of radon gas and radioactive particles and other hazardous materials as well as offensive odors onto Plaintiffs' property, in disregard of applicable regulations and property rights.

188.   Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances and noxious odors. Defendant's negligence diminished Plaintiffs' property value.

189.   Plaintiffs' injuries were the result of wastes generated, disposed of, and controlled by Defendants.

190.   Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

191.   Defendants' negligent acts and omissions were a direct and proximate cause of

Plaintiffs' injuries. Plaintiffs are entitled to recover damages for damage to property and/or loss of use of property.

## COUNT V – NEGLIGENCE PER SE
### (Brought individually and on behalf of the Class)

192.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

193.    Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80- 3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Missouri Clean Water Act, Mo. Rev. Stat. § 644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

194.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect.

195.    The contamination of Plaintiffs' land is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

196.    Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

197.    Defendants' collective negligence throughout the history of the mishandling and

41

improper dumping hazardous, toxic, carcinogenic, radioactive wastes in the Landfill area has resulted in repeated releases of radon gas and radioactive particles and other hazardous materials as well as offensive odors onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

198.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances and noxious odors. Defendant's negligence diminished Plaintiffs' property value.

199.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY
### (Brought individually and on behalf of the Class)

200.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

201.    Defendants engaged in the ultrahazardous activity of handling, storing, and/or disposing of radioactive waste.

202.    By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' and their property.

203.    Defendants have been unable or intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

204.    The risk of harm created by Defendants' acts and omissions is significant.

205.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value. Such contamination is incompatible with the normal use and enjoyment of Plaintiffs' Property.

206.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

207.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of said activities.

208.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF
### (Brought individually and on behalf of the Class)

209.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

210.    Defendants have tortiously contaminated Plaintiffs' property with hazardous, toxic, carcinogenic, radioactive wastes.

211.    The Defendants' tortious acts threaten the safety and normal use and enjoyment of the property of Plaintiffs and the proposed Class.

212.    The radioactive contamination of the property of Plaintiffs and the proposed Class has caused a significant increased risk to Plaintiffs and Class members, and therefore Plaintiffs and Class are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout the Property.

213.    The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

214.    Therefore, Plaintiffs seek injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the property of Plaintiffs and the proposed Class, consistent with contemporary scientific principles. Plaintiffs seek injunctive and equitable relief

43

to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

215.    Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

216.    Such injunctive and equitable relief will decrease the radioactive contamination risks of Plaintiffs' Property, decrease the interference with the use and enjoyment of said property, and further mitigate Plaintiffs' damages.

## COUNT VIII – CIVIL CONSPIRACY
### (Brought individually and on behalf of the Class)

217.    Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

218.    Defendants wrongfully and fraudulently agreed and conspired together to injure Plaintiffs and members of the Class, by wrongfully releasing radioactive wastes, as more fully alleged herein.

219.    Defendants wrongfully and fraudulently agreed and conspired together to take the actions alleged herein giving rise to causes of action for nuisance, trespass, negligence, negligence per se, strict/absolute liability, injunctive relief, and punitive damages as alleged herein.

220.     As result of the conspiracy of the Defendants, Plaintiffs and members of the Class have suffered damages, as more fully alleged herein.

## COUNT IX – PUNITIVE DAMAGES
### (Brought individually and on behalf of the Class)

221.     Plaintiffs reallege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

222.     Defendants committed one or more of the willful, wanton, malicious, reckless, and outrageous acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

223.     Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiffs and others similarly situated.

224.     The willful, wanton, malicious, reckless, and outrageous acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiffs, and others similarly situated.

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiffs pray for judgment in favor of Plaintiffs and Class and against Defendants Bridgeton Landfill, LLC, Republic Services, Inc., Allied Services, L.L.C., and Cotter Corporation, as well as awarding the following to Plaintiffs and against Defendants:

> a)     an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs

and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

b)      an award of double damages for malicious trespass as provided for under Mo. Rev. Stat. § 537.330;

c)      an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future; costs and attorney fees;

d)      interest on the above amounts as allowed by law, including but not limited to pre- and post-judgement interest;

e)      for appropriate injunctive and equitable relief, permitted by law or equity including a preliminary and/or permanent injunction enjoining Defendants from continuing the unlawful conduct as set forth herein and directing Defendants to identify, with Court supervision, members of the Class in order to compensate them and to clean up all contamination, and including medical monitoring; and

f)      for any further relief this Court deems just and proper.

Dated:  February 9, 2023                    Respectfully submitted,

                                            KEANE LAW LLC

                                            /s/ *Ryan A. Keane*
                                            Ryan A. Keane, #62112
                                            Tanner A. Kirksey, #72882
                                            7711 Bonhomme Ave., Ste. 600
                                            St. Louis, MO 63105
                                            Phone: (314) 391-4700
                                            Fax: (314) 244-3778
                                            ryan@keanelawllc.com
                                            tanner@keanelawllc.com

                                            JOHNSON GRAY, LLC
                                            Anthony D. Gray, #51534
                                            319 North 4th Street, Suite 212
                                            St. Louis, MO 63102
                                            Phone: (314) 385-9500
                                            agray@johnsongraylaw.com

                                            COOPER LAW FIRM, L.L.C.
                                            Barry J. Cooper, Jr., TX Bar #24057527 *pro hac vice*
                                            Celeste Brustowicz, LA Bar #16835 *pro hac vice*
                                            Victor Cobb LA Bar #36830 *pro hac vice*
                                            1525 Religious Street
                                            New Orleans, LA 70130
                                            Phone: (504) 566-1558
                                            ssmith@sch-llc.com
                                            bcooper@sch-llc.com
                                            cbrustowicz@sch-llc.com
                                            vcobb@sch-llc.com

                                            and

                                            Kevin W. Thompson (WV Bar #5062) *pro hac vice*
                                            David R. Barney, Jr. (WV Bar #7958) *pro hac vice*
                                            2030 Kanawha Boulevard, East
                                            Charleston, WV  25311
                                            Telephone:  304-343-4401
                                            Facsimile:  304-343-4405
                                            Email:  kwthompson@gmail.com

                                            *Attorneys for Plaintiffs and proposed Class*

47

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a true and correct copy of the foregoing was served on all counsel of record via this court's ECF/PACER electronic filing notification system on February 9, 2023.

/s/ *Ryan A. Keane*