# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN C. KITCHIN, JR., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 4:18-cv-00672-CDP |
| | ) | |
| vs. | ) | |
| | ) | |
| BRIDGETON LANDFILL, LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT COTTER CORPORATION (N.S.L.)'S MOTION TO DISMISS

From 1942 to 1957, uranium ore was processed in downtown St. Louis in association with the Manhattan Project. *See* Plaintiffs' Second Amended and Supplemental Complaint ("SASC"), ¶ 34. Cotter Corporation purchased the wastes created by this processing in 1969. *Id*. at ¶ 40. Included in these wastes were 8,700 tons of leached barium sulfate residues ("LBSR"), which was created by the uranium processing in downtown St. Louis. *Id*. at ¶ 3. After years of seeking legal and proper disposal options for the LBSR, Cotter mixed the LBSR with contaminated soil and dumped it at a landfill that was never designed for the storage of such wastes. *Id*. at ¶ 47. Plaintiffs' claims arise out of this improper disposal and acceptance of the wastes.[1]

As Cotter has previously testified, and as this Court previously determined in the factually identical *Dailey* case, the wastes Cotter disposed of and the Landfill Defendants accepted were not "source, special nuclear, or byproduct material" at the time of this occurrence. *Dailey v. Bridgeton Landfill, LLC*, No. 4:22-cv-116-CDP, ECF No. 76 at page 9 (July 6, 2022). Therefore, the

---

[1] "[P]rocessing uranium ore involves three steps: mining, milling, and storing 'tailings.' Mining is the extracting of uranium ore from the ground; milling is the process of turning the substance into a usable form; and tailings are the leftover radioactive waste that must be safely stored." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1916 (2019) (Roberts, C.J., dissenting).

occurrence "did not and could not arise out of or result from hazardous properties of such material. Accordingly, there was no 'nuclear incident' as defined to bring this action under the PAA." *Id.* To determine otherwise would violate basic principles of federalism, because Plaintiffs' claims cannot be said to arise under a federal statute that Cotter concedes is not even applicable.[2]

Cotter's alternative argument that Plaintiffs do not sufficiently allege state law causes of action should also be rejected. Not only did Cotter concede Plaintiffs sufficiently allege causes of action for Negligence (Count IV), Negligence Per Se (Count V), Strict/Absolute Liability (Count VI), and Civil Conspiracy (Count VIII), Cotter's arguments with respect to Plaintiffs' remaining claims are contrary to Missouri law. As a result, Cotter's motion must be denied in its entirety.

## PROCEDURAL HISTORY

Plaintiffs originally filed this action on February 20, 2018, in St. Louis County, Missouri against the owners and operators of the Landfill ("Landfill Defendants"). Petition, ECF No. 1-1. The Landfill Defendants removed based on the Price Anderson Act ("PAA"), the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Class Action Fairness Act ("CAFA"). Notice of Removal, ECF No. 1.

This Court denied federal jurisdiction and remanded in May 2019, and that remand was appealed by the Landfill Defendants in May of 2019, who argued jurisdiction existed under CAFA. Notice of Appeal, ECF No. 52. Said appeal was initially denied in June of 2019, then rehearing was granted in August of 2019. In July 2021, the Eighth Circuit reversed this Court's decision and determined that jurisdiction existed pursuant to CAFA. *Kitchin v. Bridgeton Landfill, LLC*, 3 F.4th

---

[2] If this Court determines that Plaintiffs do allege a nuclear incident and their claims arise under the PAA, the appropriate remedy is leave to amend because Plaintiffs have never "disavowed" the ability to plead a "public liability action" pursuant to the PAA. Rather, based on Cotter's own testimony, and this Court's prior decision in *Dailey*, Plaintiffs have simply alleged that their claims do not fall within the scope of the PAA because the wastes at issue were not even regulated by the Atomic Energy Act.

1089, (2021), *cert. denied*, 142 S. Ct. 1111 (2022).

The Landfill Defendants then filed a Third-Party Complaint against Cotter in October 2021. Plaintiffs filed a Petition for Writ of Certiorari with the U.S. Supreme Court in November of 2021 appealing the Eighth Circuit's decision on CAFA. This Petition was denied in February of 2022. Finally, a stay was entered on April 26, 2022, pending the result of a Petition for Writ of Certiorari filed with the U.S. Supreme Court related to *Banks, et al. v. Cotter Corp., et al.*, Case No. 4:20CV1227 JAR (E.D. Mo.) and *In re Cotter Corp.* (N.S.L.), 22 F. 4th 788 (8th Cir. 2022). After the stay expired, Plaintiffs filed their Second Amended and Supplemental Complaint to comply with federal pleading standards and substitute class representatives.

## LEGAL STANDARD & RESERVATION OF RIGHTS UNDER RULE 12(D)

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id*. "Determining whether a complaint states a plausible claim for relief [is] ... a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. Generally, claims filed within the federal courts are governed by Federal Rule of Civil Procedure 8(a)(2) which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Twombly*, 550 U.S.at 555.

This legal standard is subject to change, however, as Defendant Cotter submitted twenty-seven (27) exhibits in connection with its motion and memorandum. ECF 169. These twenty-seven

exhibits (which Cotter artfully labels as "attachments") present matters outside the Complaint, and would convert the legal standard and treatment of the underlying motion to one of a motion for summary judgment *if* the Court considers them in its determination. In short, if the Court considers "matters outside the pleading" in deciding Cotter's motion to dismiss, "Rule 12(b)(6) requires that the motion be treated as one for summary judgment." *Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) (internal quotations omitted); *Gibb v. Scott*, 958 F.2d 814, 816 (8th Cir. 1992); Fed. R. Civ. P. 12(d). This is an explicit requirement of Rule 12. *See, e.g., Evans v. McDonnell Aircraft Corp.*, 395 F.2d 359, 361–62 (8th Cir. 1968) ("Since both parties filed affidavits and exhibits in support of their respective positions, which were not excluded by the District Court, the motion to dismiss should properly have been treated as one for summary judgment."). Once converted, "[u]nless the pleadings and supporting documents disclose ***beyond any doubt*** the absence of a genuine issue of fact, summary judgment should not be entered." *Id.* (emphasis added). If Cotter's motion is converted as set forth above, Plaintiffs specifically reserve the right to both receive notice *and* be given "a reasonable opportunity to present all the material that is pertinent to the motion."[3] Fed. R. Civ. P. 12(d); *Country Club Ests., L.L.C. v. Town of Loma Linda*, 213 F.3d 1001, 1005 (8th Cir. 2000) (nonmovant was entitled to notice of Rule 12(d) conversion).

## ARGUMENT

### I.    Plaintiffs' Claims Do Not Arise Under the Price Anderson Act

As this Court has previously decided in a factually identical case, the PAA does not apply. *Dailey v. Bridgeton Landfill, LLC*, No. 4:22-cv-116-CDP (E.D.Mo.). Cotter's only "new" arguments on this front involve the "artful pleading doctrine" and post-1978 definitions of "byproduct material"—neither of which are dispositive or will change the Court's analysis.

---

[3] This includes, if necessary, the opportunity to submit an affidavit under Rule 56(d) at a date to be determined by the Court.

Congress enacted the Atomic Energy Act of 1954 to eliminate the federal government's monopoly over the atomic industry and to encourage private sector involvement through a system of licensing and regulation. *Duke Power Co. v. Carolina Env't Study Grp., Inc*., 438 U.S. 59, 63 (1978). Despite its previous assertions that the wastes at issue in this case "no longer met the definition of source material and was no longer licensable"[4] pursuant to AEA, Cotter now argues that Plaintiffs' claims "arise under" the Price Anderson Act,[5] an amendment to the AEA establishing a compensation scheme and liability cap for "nuclear incidents" at certain facilities.

In other words, Cotter stubbornly argues that Plaintiffs' claims arise under the PAA, despite the fact that the wastes at issue are not even licensed or regulated pursuant to the AEA. This argument is misguided. To hold that Plaintiffs' claims arise under an amendment to the AEA, when the AEA is not even applicable, would violate principles of federalism and Article III of the United States Constitution. A case cannot be said to arise under a federal statute where that statute is nothing more than a jurisdictional grant.

### A. Plaintiffs Do Not Allege a "Nuclear Incident"

A "nuclear incident" requires three elements: (1) any occurrence, including an extraordinary nuclear occurrence, (2) causing bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, and (3) *arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material*. 42 U.S.C. § 2014(q). As Cotter has previously testified, the wastes that were dumped at the Landfill were not source, special nuclear, or byproduct material. Accordingly, Plaintiffs' claims do not constitute a "nuclear incident."

---

[4] SASC, ¶ 57 (quoting Hamrick Deposition, Volume II, October 6, 2016, at page 54).
[5] 42 U.S.C. § 2210.

### i. *The "artful pleading doctrine" is inapplicable*

As an initial matter, Cotter argues Plaintiffs' claims arise under the PAA and must be construed as such pursuant to the "artful pleading doctrine." ECF 165. However, the artful pleading doctrine has nothing to do with the interpretation or application of the PAA; it simply "allows **removal** where federal law completely preempts an asserted state-law claim." *Rivet v. Regions Bank of Louisiana*, 522 U.S. 470, 471 (1998) (emphasis added). Since the parties are already in federal court, this doctrine is inapplicable. This doctrine is further inapplicable as the PAA does not completely preempt state law standards. 42 U.S.C. § 2210; 42 U.S.C. § 2014(hh). In short, Defendant is misusing a Rule 12(b)(6) motion to argue the PAA applies, then asking the Court to fill in the "gaps" in its argument via an inapplicable removal doctrine.[6]

### ii. *In re Cotter is irrelevant*

Second, Cotter's attempt to claim that the Eighth Circuit has determined the PAA applies to all claims against Cotter is misplaced. Especially as this Court has already issued its post-*In re Cotter* decision in the *Dailey* matter. 4:22-cv-116-CDP.

The Eighth Circuit's decision in *In re Cotter Corp*., (N.S.L.), 22 F.4th 788 (8th Cir. 2022) is related to the first element of a nuclear incident. Specifically, the decision gives the word "occurrence" its ordinary meaning resulting in a broad interpretation of the definition of nuclear incident. Based on this broad interpretation, the Eighth Circuit reasoned that there had been an "occurrence" sufficient to establish a nuclear incident even though Cotter was never licensed or indemnified pursuant to the PAA. Regardless, the Eight Circuit's holding that "an indemnity agreement is not a prerequisite for jurisdiction under the PAA's jurisdictional grant" does not affect the third element of a nuclear incident which requires that the Plaintiffs' claims arise from source,

---

[6] To the extent the Court agrees with Cotter, Plaintiffs should be granted leave to amend and actually plead the PAA.

special nuclear, or byproduct material. 42 U.S.C. § 2014(q).

Critically, Cotter concedes that the radioactive wastes at issue in the *In re Cotter Corp.* matter, which is related to contamination at Latty Avenue and Coldwater Creek, are different from the radioactive materials at issue here. The bottom line is that Plaintiffs' claims do not arise from the use of the licensed radioactive material at the Latty Site, but rather from unlicensed mill tailings disposed at the Landfill. As the Court shall see (if it has not already), Cotter's position in this motion is contrary to its prior testimony in other matters involving this exact same waste. It has previously testified several times that the material at issue in this case was not source material or byproduct material.

### iii. *Mill tailings wastes were not included in the definition of "byproduct material" at the time of the occurrence from which Plaintiffs' claims arise*

"[P]rocessing uranium ore involves three steps: mining, milling, and storing 'tailings.' Mining is the extracting of uranium ore from the ground; milling is the process of turning the substance into a usable form; and tailings are the leftover radioactive waste that must be safely stored." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1916 (2019) (Roberts, C.J., dissenting).

A review of Plaintiffs' Second Amended and Supplemental Complaint clearly demonstrates that Plaintiffs' claims are based solely upon radioactive "wastes" or "mill tailings." From 1942 to 1957, uranium ore was processed in downtown St. Louis in association with the Manhattan Project. SASC, ¶ 34. Cotter Corporation purchased the waste created by this processing in 1969. *Id*. at ¶ 40. In 1973, Cotter disposed of, and the Landfill Defendants accepted, some of these wastes at a landfill that was never designed for the storage of such waste. *Id*. at ¶ 47. Plaintiffs' claims arise out of this improper disposal and acceptance of the waste.

As this Court recognized in factually identical case, millings tailings wastes were not

included in the definition of "byproduct material" until 1978 when Congress expanded the definition under Title II of the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA) to include uranium and thorium mill tailings. *Dailey*, No. 4:22-cv-116-CDP, ECF No. 76 at page 8 (citing PL 95-604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021). Moreover, UMTRCA is prospective in application as the amendments made by Title II of the Act clearly provides it "shall take effect on the date of the enactment of this Act." *Id*. As this Court correctly stated, the mill tailings waste Cotter disposed of in 1973 "were not 'source, special nuclear, or byproduct material' at the time of the alleged occurrence in this action. The occurrence therefore did not and could not arise out of or result from hazardous properties of such material. Accordingly, there was no 'nuclear incident' as defined to bring this action under the PAA." *Id*.

Cotter attempts to get around this reality by pointing to allegations regarding studies, conducted after 1978, which document the impacts of the improper dumping which occurred in 1973. Cotter also points to allegations regarding the Defendants' failure to properly remediate the contamination which was caused by the improper dumping in 1973. Cotter's reliance on these allegations, related to the impacts of the contamination, and Defendants' failure to properly remediate, does not change the fact that the occurrence from which Plaintiffs' claims arise was in 1973, before the "the tailings or wastes produced by the extraction or concentration of uranium or thorium" were included in the definition of "byproduct material."

### iv.  *The wastes at issue do not meet the definition of Source Material*

Cotter argues that because the radioactive wastes which they improperly disposed of contained uranium and thorium, the wastes meet the definition of "source material". However, in two separate depositions, Cotter has testified that the wastes which were dumped at the Landfill did not meet the definition of source material:

8

- "If you reduce the size of the particle that you're talking about, you can get down to a single atom of uranium, which is obviously source material. If there's not a reasonable way to separate that atom out when you have the material in your hand, *by definition, it's no longer source material*." SASC, ¶ 57 (quoting Hamrick Deposition, Volume II, July 26, 2019, at page 28).

- "Once the Barium sulfate was mixed with soil, it was no longer – *no longer met the definition of source material* and was no longer licensable." SASC, ¶ 57 (quoting Hamrick Deposition, Volume II, October 6, 2016, at page 54).

Moreover, Cotter's proposed interpretation is contrary to basic statutory construction which dictates that Courts "must avoid statutory interpretation that renders any section superfluous and does not give effect to all of the words used by Congress. *In re Windsor on the River Assocs., Ltd.*, 7 F.3d 127, 130 (8th Cir. 1993). To support its argument that Plaintiffs' claims arise from "source material", Cotter provides an incomplete definition. The complete definition of "source material" is "(1) uranium, thorium, or any other material which is determined by the Commission pursuant to the provisions of section 2091 of this title to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time." 42 U.S.C. § 2014(z). If Cotter were correct and any material containing uranium or thorium is "source material", that would render the second part of this definition superfluous because any "ores containing one or more of the foregoing materials" would already be source material.

### B. Cotter's Interpretation Would Violate Basic Principles of Federalism and Lead to Absurd Results

In addition to Cotter's inconsistent characterization of the wastes, Cotter admits that the wastes disposed of in the Landfill were "no longer subject to licensing". *See* Cotter MIS of MTD at page 10. This admission alone, that the wastes were not licensed or regulated pursuant to the AEA, is sufficient for the Court to hold that Plaintiffs' claims do not arise under the AEA, or its amendment related to indemnification and liability limitation, the PAA. To hold otherwise would violate principles of federalism and Article III of the United States Constitution, because a case

cannot be said to arise under a federal statute where that statute is nothing more than a jurisdictional grant. *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 849 (3d Cir. 1991) (citing *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat) 738, 6 L. Ed. 204 (1824).

The Third Circuit in *In re TMI Litig. Cases Consol. II* determined that Article III was satisfied; however, it was under fundamentally different circumstances. The TMI facility was properly licensed and indemnified pursuant to the PAA, and the wastes at issue were licensed and regulated by the AEA. Neither is true here. Cotter never maintained financial protection pursuant to 42 U.S.C. § 2210(a) or had an indemnification agreement pursuant to 42 U.S.C. § 2210(c), and Cotter explicitly conceded that the wastes at issue were not licensable pursuant to the AEA.

As Cotter would have it, the provisions of the AEA requiring those involved in the nuclear industry to obtain licenses would be meaningless. Under Cotter's rationale, the PAA would cover the properly licensed and indemnified owner of a nuclear power plant, as well as any corporate opportunist who foregoes licensing and regulations to conduct operations at a discount, and even those who seek to do evil. It would mean that virtually any claim would arise under the PAA, even claims that the Atomic Energy Act does not cover. This Court should reject Cotter's invitation to depart from the purposes of the PAA and AEA by assigning an interpretation that defeats public policy and results in absurdity.

### C.  Cotter's Interpretation Violates Due Process

Cotter argues that the PAA provides the exclusive means by which Plaintiffs can be compensated, while at the same time maintaining that the AEA does not cover the waste in question. That is not and cannot be the law. The wastes were either licensed and regulated pursuant to the AEA and Defendants are in violation of federal regulations for the improper disposal of licensed material, or they were not licensed or regulated, in which case Plaintiffs' claims proceed

under state law. To permit both would be a violation of Plaintiffs' due process rights because Congress cannot eliminate longstanding common law right without providing any "reasonable alternative remedy" unless there is a compelling reason to do so.[7] Accordingly, if this Court accepts Cotter's argument that Plaintiffs' claims arise under the PAA, Cotter is in violation of federal regulations and must be judicially estopped from asserting that the materials dumped in the landfill were not licensed or regulated.[8]

### D.  Plaintiffs Have Not Disclaimed Ability to Assert Claims Pursuant to the PAA

Despite Cotter's insistence otherwise, Plaintiffs have never claimed that they are unable to "plead sufficient facts to state a claim against Cotter under the PAA." Instead, Plaintiffs have simply alleged that "[n]either the Atomic Energy Act nor the Price-Anderson Act apply to indisputably hazardous, toxic and carcinogenic wastes at issue". SASC, ¶ 61. This allegation is based on Cotter's own testimony and this Court's opinion in *Dailey v. Bridgeton Landfill, LLC, et al.,* Case No. 4:22-cv-116-CDP, Doc No. 76. Because the AEA does not cover the waste at issue, Plaintiffs allege that their "claims do not fall within the scope of the Price-Anderson Act"[9] and that "Plaintiffs do not allege any cause of actions arising under any laws of the United States."[10] If this Court is to determine that Plaintiffs' claims do arise under the PAA despite the waste at issue not being covered by the AEA, then Plaintiffs should be given leave to amend to bring their cause of action under the PAA. *See* Fed. R. Civ. P. 15(a)(2).

## II.   Plaintiffs Have Sufficiently Alleged State Law Causes of Action

As a last-ditch effort, Cotter cherry-picks portions of Missouri law—taking cases out of

---

[7] *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 93-94 (1980).
[8] *Smith v. As Am., Inc*., No. 3:12-CV-05048-NKL, 2014 WL 4660096, at *1–2 (W.D. Mo. Sept. 17, 2014) (citing *Stallings v. Hussmann Corp*., 447 F.3d 1041, 1047 (8th Cir.2006)).
[9] SASC, ¶ 53.
[10] *Id*. at ¶ 52.

context—to throw one-paragraph arguments at some[11] of Plaintiffs' state law causes of action. Each of Cotter's points are easily countered, and Cotter's motion must be denied on these points as well.

### A.  Missouri Nuisance Law Does Not Require Land Ownership by Cotter

First, Cotter argues it cannot be liable for nuisance because it does not own the Landfill. ECF 165, p. 14. Cotter cites two cases for the proposition that ownership of land is a prerequisite to a nuisance claim. It first cites *Frank v. Environmental Sanitation Management*, but *Frank* does not hold that property ownership is a key element of nuisance law; the focus of *Frank* is on *use* of land. 687 S.W.2d 876, 880 (Mo. banc 2001) ("The crux of a nuisance case is unreasonable land use."). Cotter also cites *State ex rel Ely v. Bandall*, a Prohibition-era decision seeking to prohibit the operation of a speak-easy as a nuisance. 220 Mo. App. 1222 (1927). That case is not relevant to current understandings of tort law in Missouri, as the decision did not address the pleading requirements of a suit for damages. *Id.*

Missouri courts have expressly rejected the proposition Cotter suggests, that a defendant's land ownership is required for nuisance claims. *City of Greenwood v. Martin Marietta Materials Inc.*, 299 S.W.3d 606, 617 (Mo. App. 2009); *Rosenfeld v. Thoele*, 28 S.W.3d 446, 452 (Mo. App. 2000) (citing 66 C.J.S. *Nuisances* § 75(1998) ("It is not necessary in order to charge a person with liability for a nuisance that he should be the owner of the property on which it is created, ***but it is sufficient that he created the nuisance*** or exercises control over the nuisance-causing property.") (emphasis added); 58 Am Jur 2d, *Nuisances* § 117 (1989) ("While the defendant in a nuisance action frequently is the owner the property alleged to be the source of the nuisance, ***property***

---

[11] Cotter specifically states that it challenging "most of", not all of, Plaintiffs' causes of action. ECF 165. It therefore appears Cotter is conceding Plaintiffs properly pled their negligence, negligence per se, strict liability/absolute liability, and civil conspiracy counts.

***ownership is generally not a prerequisite to nuisance liability***.") (emphasis added).

Having alleged Cotter's unreasonable use of land (illegal disposal of radioactive materials) which has substantially impaired Plaintiffs' right to peacefully enjoy their property, Plaintiffs' Complaint sufficiently states a claim for nuisance against Cotter. *See* SASC, ¶ 4 ("After years of seeking legal and proper disposal options for the LBSR, in 1973, Cotter mixed the 8,700 tons of LBSR with contaminated soil at the Latty Avenue Site. Despite knowing that these materials were radioactive, Cotter Corporation caused to be dumped, and the Landfill Defendants accepted, over 46,000 tons of the radioactive soil mixture at the West Lake and/or Bridgeton Landfills…"). Cotter's argument is therefore completely contrary to current black letter law and the facts alleged, and should be denied.

### B. Missouri Trespass Law Requires Direct Interference with Plaintiffs' Properties, not Direct *Placement* as Cotter Contends

Second, Cotter contends "Plaintiffs' purported trespass claim falls short… because any contamination from the Landfill to Plaintiffs' property would have occurred *from the Landfill*, not directly from Cotter…". ECF 165, pp. 14-15 (emphasis added). Cotter is incorrect.

Cotter misses the point and jumps to an unsupported conclusion; "direct interference" does not equal direct *placement* under Missouri trespass law. "The essence of an action for trespass is violation of possession." *Int'l Bhd. of Elec. Workers v. Monsees*, 335 S.W.3d 105, 108 (Mo. App. 2011). Missouri courts have clearly held that "if, ***as a result of the defendant's operation***, the polluting substance is deposited upon the plaintiff's property, thus interfering with his exclusive possessory interest by causing substantial damage to the *res,* then the plaintiff may seek his remedy in trespass." *Williams v. Monsanto Co.*, 856 S.W.2d 338, 340 (Mo. App. 1993) (quoting *Maryland Heights Leasing, Inc. v. Mallinckrodt, Inc.*, 706 S.W.2d 218, 225 (Mo. App. 1985)) (emphasis added). For example, in *Cook v. DeSoto Fuels, Inc.*, Defendant DeSoto had operated a gas station

13

whose underground gas tanks leaked, causing the water on plaintiffs' property to become contaminated. 169 S.W.3d 94, 100 (Mo. App. 2005). At the time suit was filed, DeSoto "had ceased operating its gas station", making its "last conduct" (as Cotter states) many years before litigation. *Id*. This was not fatal to plaintiffs' trespass claim. *Id.* Nor should the same argument from Cotter be fatal here. *See also Maryland Heights Leasing, Inc.*, 706 S.W.2d at 226 (Where the court concluded "that radioactive emissions may constitute trespass."). Plaintiffs directly allege that it was Cotter who caused the radioactive waste materials and contaminated soil to be dumped at the Landfill. *See* SASC ¶ 4. Thus, "as a result of the defendant's operation," the toxic and radioactive materials were deposited on Plaintiffs' properties.[12] *Williams*, 856 S.W.2d at 340. Cotter's argument fails, and Plaintiffs' trespass claim must survive.

### C.   Plaintiffs have Sufficiently Alleged Underlying Causes of Action Which Permit Claims for Injunctive and Punitive Damages

Third, Cotter states that Plaintiffs' claims for injunctive relief and punitive damages are not "cognizable causes of action, and both should be dismissed." ECF 165, p. 15. Once again, Cotter is mistaken.

On punitive damages, Missouri law does state "[a] punitive damage claim is not a separate cause of action; it must be brought in conjunction with a claim for actual damages." *Klein v. Gen. Elec. Co.*, 728 S.W.2d 670, 671 (Mo. App. 1987). But to that end, there is precedent for—and Missouri courts have allowed—separate counts for punitive damages, recognizing that a "count" is not the same as a "cause of action." *Gould v. Starr*, 558 S.W.2d 755, 770 (Mo. App. 1977) (Awarding punitive damages against defendant where plaintiff pled punitive damages as "Count II" which adopted the allegations of Count I). Here, Plaintiffs bring one "count" for punitive

---

[12] There is no arguing with Plaintiffs' allegations that the deposit of radioactive and toxic materials directly interfered "with [their] exclusive possessory interest" in the subject properties. *Williams*, 856 S.W.2d at 340; *See* SASC, ¶ 4-10.

damages with four paragraphs, specifically noting that "The willful, wanton, malicious, reckless, and outrageous acts of Defendants, ***as detailed above***, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiffs, and others similarly situated." SASC, ¶ 224 (emphasis added). This is not a separate cause of action; it is a count "brought in conjunction with" claims for actual damages. *Klein*, 728 S.W.2d at 671. Cotter's argument fails here.

On injunctive relief, Cotter just needed to finish the citation it provided in its Memorandum: "an injunction is a remedy and not a cause of action; therefore, it must be based on some recognized and pleaded legal theory." *Goerlitz v. City of Maryville*, 333 S.W.3d 450, 455 (Mo. 2011), *abrogated by Glendale Shooting Club, Inc. v. Landolt*, 661 S.W.3d 778 (Mo. 2023). Here, Plaintiffs' injunctive relief count is clearly based on "recognized and pleaded" legal theories. For example, "nuisance and injunction causes of action" go hand-in-hand. *See Campbell v. Anderson*, 866 S.W.2d 139, 144 (Mo. App. 1993) (Where plaintiffs' Count II for nuisance and Count III for injunctive relief were both tried by the court). Thus, Cotter's argument fails on this count as well.

### D. Plaintiffs Have Pled Personal Property Damages, Supporting Their Request for Section 557.330 Double Damages for Malicious Trespass

Finally, Cotter argues that "[b]ecause Plaintiffs do not allege damage to personal property, their claim for double damages under Section 557.330 should be stricken." Cotter references Plaintiffs' Prayer for Relief, ¶ B. However, Plaintiffs allege throughout their Complaint damage to property—around 130 times. *See, e.g.*, SASC ¶ 13-18, 175-76, 191, etc. Property includes and encompasses both personal and real property, as set forth in Plaintiffs' Prayer for Relief, ¶ A (where Plaintiffs request "an award of actual, general, special, incidental, statutory, compensatory and consequential damages" for both real and personal property). This must have been a simple oversight by Cotter.

## CONCLUSION

For the reasons set forth above, Cotter's Motion to Dismiss must be denied.

Dated: May 1, 2023                    Respectfully submitted,

                                      KEANE LAW LLC

                          By:     */s/ Tanner A. Kirksey*
                                  Ryan A. Keane, #62112
                                  Tanner A. Kirksey #72882
                                  7711 Bonhomme Ave., Suite 600
                                  St. Louis, MO 63105
                                  314-391-4700
                                  314-244-3778 (fax)
                                  ryan@keanelawllc.com
                                  tanner@keanelawllc.com

                                  JOHNSON GRAY, LLC
                                  Anthony D. Gray, #51534
                                  2705 Dougherty Ferry Rd., Suite 100
                                  St. Louis, MO 63122
                                  (314) 385-9500
                                  agray@johnsongraylaw.com

                                  COOPER LAW FIRM, L.L.C.
                                  Celeste Brustowicz, LA Bar #16835, *PHV forthcoming*
                                  Victor Cobb LA Bar #36830 *PHV, forthcoming*
                                  1525 Religious Street
                                  New Orleans, LA 70130
                                  Phone: (504) 566-1558
                                  cbrustowicz@sch-llc.com
                                  vcobb@sch-llc.com

                                  and

16

THOMPSON BARNEY
Kevin Thompson (WV Bar #5062) *PHV forthcoming*
David R. Barney, Jr. (WV Bar #7958) *PHV forthcoming*
2030 Kanawha Boulevard, East
Charleston, WV 25311
Telephone: 304-343-4401
Facsimile: 304-343-4405
Email:  kwthompson@gmail.com

*Attorneys for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was served on all counsel of record via this court's ECF/PACER electronic filing notification system on May 1, 2023.

*/s/ Tanner A. Kirksey*                     
