UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN C. KITCHIN, JR., et al.,     )
*on behalf of themselves and all others*  )
*similarly situated*,     )
     )
     Plaintiffs,     )
     )
     v.     )     No. 4:18  CV 672 CDP
     )
BRIDGETON LANDFILL, LLC,     )
et al.,     )
     )
     Defendants.     )

## MEMORANDUM AND ORDER

This Order grants defendants' motions to dismiss because I conclude

plaintiffs' claims arise out of a nuclear incident and so are preempted by the Price-

Anderson Act.  I will withhold entering a final order of dismissal, however, to give

plaintiffs the opportunity to move to amend their complaint.  In the event plaintiffs

fail to do so, or if a motion to amend is denied, this Order dismissing plaintiffs'

complaint will become final.

## I.  Introduction

Plaintiffs John C. Kitchin, Jr., Sharon Bishop, Melissa Mitchell, Matt Voss,

and Bluegrass Lawncare of St. Louis, LLC, are the named plaintiffs in this putative

class action seeking damages and injunctive relief against defendants Bridgeton

Landfill, LLC, Republic Services, Inc., and Allied Services, LLC (collectively

Landfill defendants), and defendant Cotter Corporation for allegedly causing

radioactive soil, dust, and air from neighboring West Lake and Bridgeton Landfills

(collectively Landfill) to contaminate their respective properties.  I have

jurisdiction over this action pursuant to the Class Action Fairness Act (CAFA), 28

U.S.C. §§ 1332(d), 1453.  *See Kitchin v. Bridgeton Landfill, LLC*, 3 F.4th 1089

(8th Cir. 2021).

The operative complaint now before the Court is plaintiffs' Second

Amended and Supplemental Complaint filed in February 2023.  (ECF 151, 152

(sealed).)  In that complaint, plaintiffs assert that defendants caused the radioactive

contamination through their improper generation, handling, storage, and disposal

of radioactive materials at the Landfill.  Plaintiffs bring the following claims under

Missouri state law against all defendants:  (1) Trespass, (2) Permanent Nuisance,

(3) Temporary Nuisance, (4) Negligence, (5) Negligence Per Se, (6) Strict

Liability/Absolute Liability, (7) Injunctive Relief seeking scientific and medical

monitoring, (8) Civil Conspiracy, and (9) Punitive Damages.

All defendants move to dismiss the complaint[1] and to strike plaintiffs' class-

action claim for medical monitoring, arguing that the Price-Anderson Act (PAA)

confers exclusive federal jurisdiction over this action and preempts plaintiffs'

---

[1] The Landfill defendants' "motion" is actually contained in what they captioned a "response" to defendant Cotter's motion to dismiss.  (*See* ECF 180.)  In that response, the Landfill defendants join in Cotter's motion to dismiss and ask the Court to dismiss plaintiffs' complaint.

state-law claims.  Cotter Corporation alternatively moves to dismiss Counts 1-3 and 7-8 of the complaint under Missouri law and, further, moves to dismiss the Landfill defendants' crossclaim against it.  For the following reasons, I conclude that the factual allegations of plaintiffs' complaint show that their claims arise out of "nuclear incident(s)" and, consequently, can be pursued under only the PAA. Because plaintiffs contend that none of their claims arise under any laws of the United States and expressly disavow application of the PAA, I will grant defendants' motions to dismiss plaintiffs' Second Amended and Supplemental Complaint as being preempted by federal law.  I will withhold entering a final order of dismissal, however, and permit plaintiffs to file an appropriate motion for leave to file an amended complaint.  In the event plaintiffs fail to do so, or if a motion to amend is denied, this Order dismissing the Second Amended and Supplemental Complaint will become final.

## II.  Procedural Background

On February 20, 2018, plaintiff Kitchin, along with two other then-named plaintiffs, filed this putative class action in St. Louis County Circuit Court.  After plaintiffs amended the petition, the Landfill defendants[2] removed the action to this Court on April 27, 2018, invoking federal subject-matter jurisdiction under the PAA; the Comprehensive Environmental Response, Compensation, and Liability

---

[2] Cotter Corporation was not a named defendant in either the original or amended state-court petition.

Act (CERCLA); and CAFA.  On May 8, 2019, I remanded the case to state court, finding that the case did not arise under either the PAA or CERCLA and, further, that the "local controversy" exception to CAFA jurisdiction applied.  (*See* Memo. & Order, ECF 51.)  The Landfill defendants appealed my CAFA ruling; and, on July 8, 2021, the Eighth Circuit Court of Appeals reversed.  *Kitchin v. Bridgeton Landfill, LLC*, 3 F.4th 1089 (8th Cir. 2021).  Mandate issued August 19, 2021, and the United States Supreme Court denied plaintiffs' petition for writ of certiorari on February 22, 2022.  142 S. Ct. 1111 (2022).

In the meantime, on January 7, 2022, the Eighth Circuit decided a central issue involving application of the PAA in a related action, *Banks, et al. v. Cotter Corp., et al.*, Case No. 4:20CV1227 JAR (E.D. Mo.).  *See In re Cotter Corp. (N.S.L.)*, 22 F.4th 788 (8th Cir. 2022).  Because that decision had the potential to affect whether the plaintiffs here could proceed on their state-law claims in this action, and specifically whether the PAA preempts the claims, I granted the parties' joint request to stay the case pending the outcome of a petition for writ of certiorari filed in *Banks*.  After the Supreme Court denied the petition, I lifted the stay in this case on December 22, 2022.  On February 9, 2023, plaintiff Kitchin and newly named plaintiffs Bishop, Mitchell, Voss, and Bluegrass Lawncare filed their Second Amended and Supplemental Complaint reasserting the state-law claims and disavowing any application of the PAA or any other law of the United States. Plaintiffs added Cotter Corporation as a defendant in the new complaint.

All defendants now move to dismiss under Federal Rule of Civil Procedure 12(b)(6), claiming that the PAA applies to the facts alleged in the complaint and preempts plaintiffs' state-law claims.  I agree and will grant the motions to dismiss.

### III.  Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is to test the legal sufficiency of the complaint.  When reviewing a Rule 12(b)(6) motion, I assume the factual allegations of the complaint are true and construe them in plaintiffs' favor.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The complaint must contain sufficient factual matter, accepted as true, to state a claim for relief "that is plausible on its face."  *Id.*  The "factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly,* 550 U.S. at 555.  The issue in determining a Rule 12(b)(6) motion is not whether plaintiffs will ultimately prevail, but whether they are entitled to present evidence in support of their claims.  *See Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011); *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

A defendant may raise the affirmative defense of federal preemption as a basis to seek dismissal under Rule 12(b)(6).  *See Dougherty v. Source Naturals, Inc.*, 148 F. Supp. 831, 835 (E.D. Mo. 2015); *Uhrhan v. B&B Cargo, Inc.*, No. 4:17-CV-02720-JAR, 2020 WL 4501104, at *1 (E.D. Mo. Aug. 5, 2020).  As the

parties raising the affirmative defense, defendants bear the burden of showing that the plaintiffs' claims are preempted. *Uhrhan*, 2020 WL 4501104, at *1 (citing *Hughes v. Union Pac. R.R. Co.*, No. 5:15-06079-CV-RK, 2017 WL 1380480, at *1 (W.D. Mo. Apr. 14, 2017)).

To the extent plaintiffs contend that the Landfill defendants' motion to dismiss should be considered a motion for judgment on the pleadings under Rule 12(c) given that it was filed after they filed their answer, I note that the legal standard applied to a Rule 12(c) motion for judgment on the pleadings is the same as that applied to a Rule 12(b)(6) motion to dismiss. *Clemons v. Crawford,* 585 F.3d 1119, 1124 (8th Cir. 2009).  My conversion of the Landfill defendants' motion to dismiss to one for judgment on the pleadings therefore does not change my analysis. *Id.*; Fed. R. Civ. P. 12(h)(2)(B).

## IV.  Factual Background[3]

From 1942 to 1957, uranium ore was processed into various uranium compounds at a facility located in downtown St. Louis, Missouri, as part of the Manhattan Project – a United States research project designed to develop the first nuclear weapons.  In the late 1940's, the Manhattan Project acquired an additional tract of land near Lambert Airport – the St. Louis Airport Site (SLAPS) – for

---

[3] In deciding defendants' motions to dismiss, I look to the factual allegations in plaintiffs' Second Amended and Supplemental Complaint.  I have not considered matters outside the pleadings and therefore need not treat the motions as ones for summary judgment.

storage of radioactive wastes (also known as "mill tailings") created by the uranium processing at the downtown site.  Contaminated scrap was also stored at the SLAPS site.

In the late 1960's, private companies purchased and assumed responsibility for the radioactive wastes stored at SLAPS and moved the wastes to a storage site on Latty Avenue in Hazelwood, Missouri (Latty Site).  In 1969, defendant Cotter Corporation purchased and assumed responsibility for the radioactive wastes stored at the Latty Site.  The radioactive wastes Cotter purchased included 8700 tons of leached barium sulfate residues (LBSR), which contained uranium.

In 1973, Cotter mixed the 8700 tons of LBSR with contaminated soil at the Latty Site.  As a result, the soil mixture's uranium content was below the regulatory/licensable level of .05 percent.  Cotter then caused – and the Landfill permitted – the radioactive soil mixture to be dumped at the Landfill, whereupon the soil mixture was spread and used by the Landfill as daily cover.  Plaintiffs claim that about 15 acres of the Landfill are filled with radioactive wastes at a depth of up to 20 feet.

The Landfill was and is not designed to be a disposal or storage site for radioactive material.  Nor was it ever licensed to receive or possess radioactive waste.  As of December 31, 2004, the Landfill stopped accepting waste and is now used only as a transfer station for municipal waste.

A subsurface fire currently exists at the Landfill and emits noxious and

offensive odors.  Plaintiffs claim that defendants are permitting the fire to spread uncontrolled, which could affect the radioactively contaminated areas of the Landfill and cause increased risk of radioactive exposure to persons in the surrounding area.

Plaintiffs contend that radioactive material has contaminated soil, water, and air because of the dumping, spread, and improper storage of radioactive mill tailing wastes at the Landfill, resulting in the contamination of surrounding communities where their properties are located.  Plaintiffs also allege that they are at increased risk of radioactive exposure by 1) the installation of an inadequate leachate collection system at the Landfill, which resulted in spills, releases, and leaks that contributed to the groundwater and surface water contamination; and 2) the failure to control the subsurface fire at the Landfill, which could result in gas-releasing fissures and increased leachate production from large amounts of steam that could further move contaminants and radioactive materials into the groundwater.

### V.  The Defendants

Plaintiffs assert in their complaint that:

<u>Bridgton Landfill, LLC</u> – is a subsidiary of Republic Services, Inc., and has owned, operated, and managed daily operational control over the Landfill's management and environmental decisions since 1988.  Plaintiffs claim that those decisions "gave rise to the violations of law and damage to property" alleged in the complaint.

Allied Services, LLC – is a subsidiary of Republic Services, Inc., and has maintained daily operational and managerial control over the Landfill's management and environmental decisions since 2008.  Plaintiffs claim that those decisions "gave rise to the violations of law and damage to property" alleged in the complaint.

Republic Services, Inc. – with and through its subsidiaries Bridgeton Landfill and Allied Services, has maintained daily operational and managerial control over the Landfill's management and environmental decisions since 2008. Plaintiffs claim that those decisions "gave rise to the violations of law and damage to property" alleged in the complaint.

Cotter Corporation – is a Colorado corporation whose conduct in 1973 of dumping radioactively contaminated soil at the Landfill "gave rise to the violations of law and damages to property" alleged in the complaint.

## VI.  Discussion

The background and purpose of the PAA is thoroughly set out in my Memorandum and Order entered May 8, 2019.  (ECF 51 at pp. 10-14.)  I incorporate that background as if fully set forth herein and will provide additional background as needed to address the parties' arguments.

In that Memorandum and Order, I concluded that the PAA applied to only those public liability claims that involved nuclear incidents arising out of licensed activity with the Nuclear Regulatory Commission or contracted activity with the

- 9 -

Department of Energy operating under indemnification agreements. (ECF 51 at pp. 14-18.) Because plaintiffs alleged neither NRC-licensed activity nor DOE-contracted activity with indemnification, I held that the PAA did not apply to their claims. (*Id.* at p. 18.) More than two years later, in *In re Cotter Corp.*, the Eighth Circuit held that "the PAA provides federal question jurisdiction over all 'nuclear incidents,' regardless of whether the defendant had an applicable license or indemnity agreement." 22 F.4th at 793. Given that decision and the plaintiffs' later-filed Second Amended and Supplemental Complaint, the question of whether the PAA applies to plaintiffs' claims is squarely before me again.[4]

A.    "Nuclear Incident"

In 1988, Congress enacted the Price-Anderson Amendments Act of 1988 (the 1988 PAA), which broadened the PAA to create a federal cause of action for "any public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n)(2). A "public liability action" is "any suit asserting public liability." 42 U.S.C. § 2014(hh). And "public liability" means "any legal liability arising out of or resulting from a nuclear incident[.]" 42 U.S.C. § 2014(w). Accordingly, only suits that involve "nuclear incidents" as defined by the PAA are

---

[4] All parties argue that the other side should be estopped from arguing positions on this question that are inconsistent with positions they took in other litigation. Given the evolving legal landscape of the PAA's application to various claims, I will not bind the parties to arguments made in other courts at other times in other litigation. *Biomedical Pat. Mgmt. Corp. v. California, Dep't of Health Servs.*, 505 F.3d 1328, 1342 (Fed. Cir. 2007), *cited approvingly in Gray v. City of Valley Park, Mo.*, 567 F.3d 976, 982 n.5 (8th Cir. 2009).

subject to PAA federal-question jurisdiction.

As defined in the 1988 PAA, a "nuclear incident" is

any occurrence, including an extraordinary nuclear occurrence, within
the United States causing, within or outside the United States, bodily
injury, sickness, disease, or death, or loss of or damage to property, or
loss of use of property, arising out of or resulting from the radioactive,
toxic, explosive, or other hazardous properties of source, special
nuclear, or byproduct material. . . .

42 U.S.C. § 2014(q).  In short, a "nuclear incident" means 1) something that takes

place within the United States, 2) causing personal injury or property damage, and

3) arising out of the hazardous properties of source, special nuclear, or byproduct

material.  *In re Cotter Corp.*, 22 F.4th at 794 (quoting 42 U.S.C. § 2014(q)).  The

definition of a "nuclear incident" under the PAA is "facially quite broad."  *Id.*

The parties agree that plaintiffs' complaint alleges facts satisfying the first

two elements of a nuclear incident under the PAA, that is, that the occurrence took

place in the United States and caused property damage and potential personal

injury.  Defendants contend that because the occurrence and damage here arose out

of the hazardous properties of source material and/or byproduct material, the third

element of a nuclear incident under the PAA is met, bringing this action within the

PAA's parameters.  For the following reasons, I agree.

    1.   *Source Material*

Under the Atomic Energy Act, 42 U.S.C. §§ 2011, *et seq.* (AEA),

The term "source material" means (1) uranium, thorium, or any other
material which is determined by the Commission pursuant to the

provisions of section 2091 of this title to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time.

42 U.S.C. § 2014(z).  Regulations promulgated by the Nuclear Regulatory Commission define "source material" as

(1) Uranium or thorium, or any combination thereof, in any physical or chemical form or (2) ores which contain by weight one-twentieth of one percent (0.05%) or more of: (i) Uranium, (ii) thorium or (iii) any combination thereof.

10 C.F.R. § 40.4.  By definition then, uranium and thorium are clearly and unequivocally source material in any physical or chemical form.

The AEA requires that any person who receives, transfers, or delivers source material must be licensed by the Commission to do so unless the "quantities of source material . . . are unimportant."  42 U.S.C. § 2092.  Moreover, the Commission may require certain reports on the handling of source material except with respect to "quantities of source material which in the opinion of the Commission are unimportant."  42 U.S.C. § 2095.  "Unimportant quantities of source material" include any mixture or compound "in which the source material is by weight less than one-twentieth of 1 percent (0.05 percent) of the mixture [or] compound[.]"  10 C.F.R. § 40.13(a).

Here, relying on testimony of a Cotter representative, plaintiffs allege in their complaint that the LBSR Cotter purchased and possessed at the Latty Site contained uranium.  (ECF 152 at ¶ 57 – "the leach Barium sulfite was above .05

percent uranium.")  Based on that same testimony, plaintiffs further allege that upon Cotter's mixing the LBSR with soil, the uranium content of the resulting soil mixture was below .05 percent, which removed the mixture from the Commission's licensing authority.  (*Id.*)  That averment is consistent with the regulation's provision that "unimportant quantities of source material" are exempt from licensing.  Plaintiffs argue that, as a result, the soil mixture cannot be considered source material because, as they allege in the complaint, Cotter's representative admitted that once the LBSR was mixed with soil, it was "no longer licensable" and "no longer met the definition of source material."  (*Id.*)  Plaintiffs' contention is misplaced.

There is nothing in the AEA or the regulations that provides for uranium to no longer be considered source material merely because its concentration in a mixture or compound falls below licensing levels.  Being mixed with soil does not change its properties.  While its relative quantity in the mixture may render it "unimportant" for purposes of licensing, unimportant quantities of source material are nevertheless quantities of source material.  The testimony of Cotter's representative does not change that reality.

Whether uranium (as part of a mixture or not) meets the federal regulatory definition of "source material" is not a factual allegation that I must accept as true on a motion to dismiss.  *See In re Poseidon Pool & Spa Recreational, Inc.*, 443 B.R. 271, 280 (E.D.N.Y. 2010) ("Questions of statutory interpretation are

considered questions of law."). *See also Twombly*, 550 U.S. at 555 (A court is "not bound to accept as true a legal conclusion couched as a factual allegation."). When a statute includes an explicit definition, I must follow that definition. *Stemberg v. Carhart*, 530 U.S. 914, 942 (2000) (citing *Meese v. Keene,* 481 U.S. 465, 484-485 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term."); *Colautti v. Franklin,* 439 U.S. 379, 392-93 n.10 (1979) ("As a rule, a definition which declares what a term 'means' . . . excludes any meaning that is not stated.")). My determination of whether the uranium in the soil mixture here constitutes "source material" is guided by the law and my interpretation of the relevant statutes and regulations, not a layperson's cursory opinion or legal conclusion. *See Meese*, 481 U.S. at 484-85 (judges have a "duty to construe legislation as it is written, not as it might be read by a layman[.]"). I therefore do not ascribe any "truth," so to speak, to the statement made by Cotter's representative that the material at issue here did not meet the definition of "source material."

On the facts alleged in the complaint, the soil mixture deposited, spread, and used as daily cover at the Landfill contained uranium, which is "source material" as defined by the AEA and the Commission's regulations. Even though the level of uranium in the mixture measured below that required for licensing, the uranium within that mixture nevertheless retained its properties as source material.

Uranium at 0.10 percent concentration or at 0.04 percent is still uranium.[5]

Accordingly, because plaintiffs allege that they suffered property damage and will suffer potential personal injury arising out of the radioactive, toxic, or other hazardous properties of source material at the Landfill, their lawsuit alleges public liability arising out of or resulting from a nuclear incident, making this a public liability action under the PAA.

2.      *Byproduct Material*

As relevant to this action, the term "byproduct material" under the AEA means, *inter alia* –

> the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content[.]

42 U.S.C. § 2014(e)(2).[6]  Mill tailings were not included in the AEA's definition of "byproduct material," however, until 1978 when Congress expanded the definition under Title II of the Uranium Mill Tailings Radiation Control Act of 1978

---

[5] Plaintiffs argue that reading § 2014(z)(1) to define source material as uranium or thorium in any quantity in any matter (such as in Cotter's soil mixture) renders § 2014(z)(2) superfluous given that uranium or thorium present in ore would already be considered "source material" under § 2014(z)(1). I disagree. Section 2014(z)(2) converts the ore *itself* – a naturally occurring raw material – to source material when it contains a certain concentration of uranium or thorium. There is no similar conversion for a mixture or compound such as Cotter's soil mixture. Unlike ore that contains uranium, soil mixture that contains uranium is not *itself* source material. *See* 42 U.S.C. § 2091 (before making a determination that material is source material, "the Commission must find that such material is essential to the production of special nuclear material").

[6] "[P]rocessing uranium ore involves three steps: mining, milling, and storing 'tailings.' *Mining* is the extracting of uranium ore from the ground; *milling* is the process of turning the substance into a usable form; and *tailings* are the leftover radioactive waste that must be safely stored." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1916 (2019) (Roberts, C.J., dissenting).

(UMTRCA) upon recognizing that uranium mill tailings

> may pose a potential and significant radiation health hazard to the public, and that the protection of the public health, safety, and welfare and the regulation of interstate commerce require that every reasonable effort be made to provide for the stabilization, disposal, and control in a safe and environmentally sound manner of such tailings in order to prevent or minimize radon diffusion into the environment and to prevent or minimize other environmental hazards from such tailings.

PL 95-604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021.  As a result of mill tailings now being included in the statutory definition of byproduct material, the Commission obtained specific licensing authority over such tailings and could regulate them after active mill operations ended.  *Id.  Cf. Waste Action Project v. Dawn Min. Corp.*, 137 F.3d 1426, 1430 (9th Cir. 1998) (quoting H.R. Rep. No. 1480, *reprinted in* 1978 U.S.C.A.A.N. 7433, 7442).

Notably, UMTRCA expressly stated that its amendments to the AEA made by Title II would not have retroactive effect.  PL 95-604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021, Title II, Sec. 208.  Consequently, the mill tailing wastes plaintiffs allege Cotter Corporation transported to and disposed of at the Landfill in 1973 – five years before UMTRCA was enacted – were not "byproduct material" under the PAA at that time.  If the alleged offensive conduct in this action involved only that which occurred in 1973 or at least prior to UMTRCA's enactment in 1978, I would have to agree that the mill tailings waste at issue was not "byproduct material" as defined at that time and could not have given rise to a nuclear incident

as byproduct material under the PAA.[7]  But, as described below, the complaint here alleges additional occurrences after 1978 involving the radioactive mill tailings waste.

In addition to the dumping and spreading of radioactive mill tailings at the Landfill in 1973, plaintiffs' complaint alleges that beginning in and occurring since at least 1988, defendants were liable for additional releases of radioactive toxins from the decaying mill tailings at the Landfill that resulted in ongoing damage to plaintiffs' properties:

- The Landfill defendants owned and operated the Landfill since 1988, and defendant Bridgeton Landfill made decisions beginning in 1988 that caused harm to plaintiffs' properties (ECF 152 at ¶¶ 22, 71);
- The Landfill defendants dealt with problems with smoldering events and increased subsurface temperatures in the 1990's and should have implemented adequate practices after that time with respect to gas extraction to avoid subsurface fires (*id.* at ¶ 186);
- Defendants Republic and Allied Services have maintained daily operational and managerial control over the Landfill since 2008 and made decisions since that time that caused harm to plaintiffs' properties (*id.* at ¶¶ 20, 21);
- Landfill defendants' harmful decisions included installation of an inadequate leachate collection system that caused spills, releases, and leaks of hazardous waste (*id.* at ¶ 88);
- Public meeting with property owners in 2013 addressed current underground fire at the Landfill, including related odors and health issues, and the potential for release of more radioactive toxins into the air and water (ECF 152 at ¶¶ 79-84);
- The EPA's proposed corrective action plan created in 2018 described

---

[7] When I remanded a related action to state court in July 2022, the only alleged conduct that remained in the case was Cotter's dumping of mill tailings at the Landfill in 1973.  Because those mill tailings could not be considered byproduct material under the PAA in 1973, I held that the PAA did not apply.  *Dailey v. Bridgeton Landfill, LLC*, Case No. 4:22CV116 CDP (E.D. Mo. July 6, 2022) (ECF 76, Memo. & Order of Remand).  I did not address in substance whether the soil mixture nevertheless contained source material.

increased future risks from radioactive decay of thorium at the Landfill (*id.* at ¶ 33);

- "Defendants' actions . . . will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes" (*id.* at ¶ 142);

- "To this day," defendants continue to disregard the presence of radioactive materials at the Landfill (*id.* at ¶ 98).

The 1988 PAA broadened the definition of nuclear incident to include "any occurrence" causing property loss or personal injury resulting from radioactive material. The ordinary and common meaning of "occurrence" – that is, "something that takes place," *see In re Cotter Corp.*, 22 F.4th at 794 – encompasses both discrete events and those that take place over time. *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 724 (6th Cir. 2021) (listing cases); *Steward v. Honeywell Int'l, Inc.*, 469 F. Supp. 3d 872, 878 (S.D. Ill. 2020). Therefore, the PAA's expansion to include "any occurrence" broadened its reach to encompass multiple releases of radioactive material over time, and not just catastrophic and singular events. *Matthews*, 15 F.4th at 724; *Steward*, 469 F. Supp. 3d at 878-79 (citing *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000)). Such multiple and continuous releases are what plaintiffs allege in their complaint here.

Although plaintiffs claim the damage began with Cotter Corporation's dumping of radioactive mill tailings waste at the Landfill in 1973 – which the Landfill then spread and used as daily cover – plaintiffs also allege that the decay process of those mill tailings continues to release radioactive particles "to this day" resulting in continuous contamination of air, water, and soil affecting the

surrounding community.  Moreover, plaintiffs allege that defendants' negligent remediation efforts and continued failure to control a subsurface fire caused and will continue to cause spills, leaks, and gas emissions of radioactive material whose decay chain began with the mill tailings dumped at the Landfill.  Because plaintiffs claim their damage is caused by contamination from continued releases of radioactive material emanating from mill tailings decay, their suit alleges post-1978 occurrences arising out of or resulting from the radioactive properties of byproduct material as defined under UMTRCA, bringing those occurrences within the strictures of "nuclear incident(s)" under the PAA.  *Matthews*, 15 F.4th at 722-23.  Therefore, as with the source material addressed above, byproduct material brings this suit within the PAA's definition of a "public liability action."

The entirety of Cotter's conduct is alleged to have occurred before mill tailings were considered byproduct material under the PAA.  But the PAA provides that "the entire suit, not just particular claims that are part of the suit, 'shall be deemed to be an action arising under Section 2010.'"  *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 194 (5th Cir. 2011) (quoting 42 U.S.C. § 2014(hh)).  Accordingly, because plaintiffs' claims against Cotter make up a part of the whole of the lawsuit, which is a "public liability action" for the reasons discussed above, the claims against Cotter also arise under the PAA.  *Id.* at 194-95.

B.    The PAA Preempts Plaintiffs' State-Law Claims

Defendants contend that the PAA "completely preempts" plaintiffs' state-

law claims in their entirety, requiring dismissal of the case. While I agree that the PAA has a preemptive effect on the case that warrants dismissal of plaintiffs' claims, I cannot say that preemption is "complete."

The "complete preemption" doctrine applies when the preemptive force of a statute "is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim[.]'" *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 393 (1987) (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987)). With such conversion, "any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law." *Id.* Because complete preemption "converts" a state cause of action to one arising under federal law, the doctrine is ordinally raised as a basis for removal as an exception to the well-pleaded complaint rule. *Id.* Complete preemption of a state cause of action thus gives the federal court subject-matter jurisdiction over an otherwise non-removable case.

Here, CAFA provided federal subject-matter jurisdiction over plaintiffs' cause of action from its inception. *See generally Kitchin*, 3 F.4th 1089. Applying the complete-preemption doctrine to convert plaintiffs' state-law claims to ones arising under federal law is therefore not necessary to this Court's exercise of jurisdiction. Even if the complete-preemption doctrine were applied to cases where federal subject-matter jurisdiction already exists, *e.g.*, *Technology Based Sols., Inc. v. Electronics Coll. Inc.*, 168 F. Supp. 2d 375, 379-80 (E.D. Penn. 2001),

the doctrine does not apply here because the PAA is not a complete-preemption statute.

As stated by the Eighth Circuit, complete preemption is "quite rare." *Johnson v. MFA Petroleum Co.*, 701 F.3d 243, 248 (8th Cir. 2012). Indeed, the Supreme Court has found complete preemption in just three statutory settings:  the Labor Management Relations Act, *see Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists & Aerospace Workers*, 390 U.S. 557 (1968); the Employee Retirement Income Security Act, *see Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58 (1987); and the National Bank Act, *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003). While the Supreme Court has noted that the PAA "resembles" complete preemption, *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 484 n.6 (1999), it distinguishes the PAA from those complete-preemption statutes given that federal law does not provide the exclusive basis for decision in PAA cases. *See Anderson*, 539 U.S. at 8. Quite the contrary, the PAA preserves state rules of decision, *see* 42 U.S.C. § 2014(hh),[8] unlike in true complete-preemption statutes where federal law "wholly displaces the state-law cause of action." *Anderson*, 539 U.S. at 8. *See also Matthews*, 15 F.4th at 721 ("At first blush, the Price-Anderson Act would seem to fit the mold of complete preemption . . . . [But] [b]y

---

[8] "A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section."

incorporating state law into the federal action, the Act does not entirely displace state law, making the Act unlike other instances of complete preemption."); *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1097 (10th Cir. 2015) (explaining the PAA is not a "complete preemption" statute because "while the Act provides a federal forum it also does much to preserve state rules of decision"). With this structure, the Supreme Court has described the PAA as "unusual" when compared to true complete-preemption statutes, describing the PAA and complete preemption as *separate* exceptions to the well-pleaded complaint rule. *See Anderson*, 539 U.S. at 6-8; *see also Neztsosie*, 526 U.S. at 484 n.6 (citing 42 U.S.C. § 2014(hh)).

Although the PAA is not a complete-preemption statute, it nevertheless preempts state-law claims given that it "leaves 'no room' for state-law causes of action arising from a nuclear incident." *Matthews*, 15 F.4th at 721 (quoting *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)). With the PAA, "Congress created a federal cause of action for public-liability claims concerning nuclear incidents . . . and incorporated state law only to the extent consistent with the Act." *Halbrook v. Mallinckrodt, LLC*, 888 F.3d 971, 977 (8th Cir. 2018). "Congress spoke clearly when stating such 'action shall be deemed an action arising under' federal law." *Id.* (quoting 42 U.S.C. § 2014(hh)). *See also id.* at 977 n.3 (listing cases). Consequently, when the factual allegations of a complaint assert a public liability as defined by the PAA, state-law claims cannot stand as separate causes of action. *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1553 (6th Cir.

1997).  On such factual allegations, "a plaintiff can sue under the Price-Anderson Act, as amended, or not at all."  *Matthews*, 15 F. 4th at 721 (internal quotation marks omitted) (listing cases).

In their Second Amended and Supplemental Complaint, plaintiffs base all of their claims on alleged occurrences that amount to a nuclear incident as defined by the PAA.  Because those claims constitute a public liability action under the PAA, they arise under federal law.  The complaint asserts only state-law claims, however – negligence, trespass, nuisance, etc. – and is therefore preempted by the PAA. *Matthews*, 15 F.4th at 721.  *See also Dailey v. Bridgeton Landfill, LLC*, 299 F. Supp. 3d 1090, 1098 (E.D. Mo. 2017) ("I agree with the many appellate courts that have examined the text, structure, history, and purpose of the PAA and found that it preempts state-law claims when a nuclear incident is alleged.")

C.    Plaintiffs' Claims Must be Dismissed

Plaintiffs raise only state-law claims in their Second Amended and Supplemental Complaint.  Because those claims are preempted, I must dismiss them – and therefore the complaint – for failure to state a claim.  In other actions involving similar claims, the plaintiffs have often brought a claim (or claims) under the PAA, either solely or in addition to other federal and state-law claims.  *See, e.g.*, *Nieman*, 108 F.3d at 1547; *McGlone v. Centrus Energy Corp.*, No. 2:19-cv-02196, 2020 WL 4431482, at *1 (S.D. Ohio July 31, 2020); *Smith v. Carbide & Chems. Corp.*, No. 5:97-CV-3-M, 2009 WL 3007127, at *1 (W.D. Ky. Sept. 16,

2009).  Here, however, plaintiffs have disclaimed reliance on the PAA.  In their complaint, they expressly state that their "claims do not fall within the scope of the Price-Anderson Act" and "do not implicate the Price-Anderson Act" because they are "freestanding state law claims concerning traditional state regulation[.]"  (ECF 152 at ¶ 53.)  As discussed above, however, plaintiffs' allegations assert liability arising from a nuclear incident as defined by the PAA.  Because such public-liability claims can be brought under the PAA "or not at all," *Nieman*, 108 F.3d at 1553, plaintiffs' complaint must be dismissed for failure to state a cognizable claim.  *Matthews*, 15 F.4th at 727-28; *see also Dailey*, 299 F. Supp. 3d at 1103 (dismissing state-law claims as preempted by the PAA).

D.    Article III and Federalism

Plaintiffs contend that the AEA does not apply to the wastes at issue in this action because the soil mixture that Cotter dumped at the Landfill was not licensable or regulated as radioactive waste under the AEA given that the concentration of source material in the mixture was below licensing levels. Plaintiffs argue that because the AEA does not apply to the wastes at issue here, its amendment – the PAA – likewise cannot apply to plaintiffs' claims.  Citing *In re TMI Litig. Cases Consol. II*, 940 F.2d 832 (3d Cir. 1991), plaintiffs also contend that the PAA is nothing more than a jurisdictional grant and that construing their claims as "arising under" the PAA and finding it to preempt their state-law claims violates principles of federalism and Article III of the United States Constitution.  I

disagree.

Plaintiffs' first argument is foreclosed by the Eighth Circuit's decision in *In re Cotter Corp.* that licensing under the AEA is irrelevant to public liability actions arising from a nuclear incident as defined by the PAA.  22 F.4th at 793-95.  And plaintiffs' reliance on *TMI II* to support their "jurisdictional grant" argument is misplaced.  In *TMI II*, the Third Circuit recognized what plaintiffs assert here – "that a statute which merely confers federal jurisdiction cannot constitute federal law under which an action arises."  940 F.2d at 850.  But the *TMI II* court held that the 1988 PAA was not merely a jurisdictional grant, finding that the federal ingredients to a cause of action under the PAA were sufficient and substantial:

> The Amendments Act [*i.e.*, the 1988 PAA] creates a federal cause of action which did not exist prior to the Act, establishes federal jurisdiction for that cause of action, and channels all legal liability to the federal courts through that cause of action.  By creating this federal program which requires the application of federal law, Congress sought to effect uniformity, equity, and efficiency in the disposition of public liability claims.  With the federal jurisdiction and removal provisions set forth in the Amendments Act, Congress ensured that all claims resulting from a given nuclear incident would be governed by the same law, provided for the coordination of all phases of litigation and the orderly distribution of funds, and assured the preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident.

*Id.* at 856-57 (citing H.R. Rep. No. 104, 100th Cong., 1st Sess., pt. 3, at 18 (1987)). The court therefore rejected plaintiffs' Article III challenge to the PAA.  *Id.* at 857-58.  For those same reasons, I reject plaintiffs' similar argument here.  *Cf. Halbrook*, 888 F.3d at 977 n.3 (recognizing that *TMI II* and other cases "explained

convincingly why claims under the Act are claims under federal law[,]" Eighth Circuit reached same conclusion by the "plain language of the Act.").  Although plaintiffs contend that, unlike the circumstances in this action, the facility and wastes at issue in *TMI II* were licensed and regulated under the AEA, I cannot ignore the Eighth Circuit's holding in *In re Cotter Corp.* that such licensing is not required for an action to arise under the PAA.

E.    Due Process and Estoppel

Plaintiffs argue that requiring actions involving unlicensed radioactive wastes to be pursued under the PAA deprives them of due process because state law provides the only remedy for injuries involving such material.  The Sixth Circuit rejected a similar argument in *Matthews*:

> Plaintiffs' argument is unpersuasive. . . . [T]he Act is an adequate alternative remedy to the claims it displaces[.] . . . [T]he Act enables a plaintiff to recover for alleged injuries from nuclear incidents by filing a public liability action under the Act. . . . Congress did not entirely eliminate application of state common law; state law still provides the substantive rules of decision for Price-Anderson claims (to the extent it does not conflict with federal law).  In short, we see no constitutional defect with the Price-Anderson scheme.

15 F.4th at 727 (internal citations omitted).  Plaintiffs here provide no argument or authority demonstrating otherwise.  Their due process claim fails.

Finally, plaintiffs contend that because the PAA applies to only licensed material, Cotter's argument that the PAA applies to this action necessarily requires that the waste material be licensed and that Cotter should therefore be judicially

estopped from asserting that the materials at issue were not licensed or regulated. Because *In re Cotter Corp.* renders plaintiffs' argument without merit, I need not address it in substance.

F.    Leave to File Amended Complaint

Throughout their memoranda in opposition to defendants' motions to dismiss, plaintiffs urge the Court to allow them to amend their complaint if I were to determine, as I have, that the claims raised in their Second Amended and Supplemental Complaint allege a nuclear incident under the PAA.  (*See* ECF 181 at p. 2 n.2, p. 6 n.6, p. 11; ECF 184 at p. 11.)  This method in seeking leave to amend a complaint is inappropriate and does not comply with the local and federal rules.  I will therefore deny plaintiffs' embedded requests for leave to amend their complaint.  I will, however, permit them to file an appropriate motion for leave to file an amended complaint in compliance with the relevant rules.  In the event plaintiffs do not file a motion for leave, or if a filed motion for leave is denied, this Order dismissing their Second Amended and Supplemental Complaint will become final.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that Bridgeton Landfill, LLC, Republic Services, Inc., and Allied Services, LLC's "Response to Defendant Cotter Corporation (N.S.L.)'s Motion to Dismiss Plaintiffs' Second Amended and Supplemental Complaint" [180] is converted to a Motion for Judgment on the

Pleadings under Fed. R. Civ. P. 12(c).

**IT IS FURTHER ORDERED** that defendant Cotter Corporation (N.S.L.)'s Motion to Dismiss Plaintiffs' Second Amended and Supplemental Complaint [164] and defendants Bridgeton Landfill, LLC, Republic Services, Inc., and Allied Services, LLC's converted Motion for Judgment on the Pleadings [180] are **GRANTED.**

**IT IS FURTHER ORDERED** that defendant Cotter Corporation (N.S.L.)'s Motion to Strike Plaintiffs' Medical Monitoring Class Allegations [166] and defendants Bridgeton Landfill, LLC, Republic Services, Inc., and Allied Services, LLC's joinder thereto [182]; defendant Cotter Corporation (N.S.L.)'s Motion to Dismiss Bridgeton Landfill, LLC's Crossclaim [177]; and defendants Bridgeton Landfill, LLC, Republic Services, Inc., and Allied Services, LLC's Motion for Oral Argument [190] are **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that within twenty-one (21) days of the date of this Order, plaintiffs may file a motion for leave to file an amended complaint. Any memorandum in opposition and brief in reply shall be filed within the time prescribed by the local rules of this Court.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 1st day of February, 2024.